**In re THE PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION.**

This Document Relates to
All Class Actions.

No. 95–4704(AMW).

United States District Court,
D. New Jersey.

July 18, 2000.

Melvyn Weiss, Brad N. Friedman, Milberg Weiss, Bershad, New York, NY, for the Class.

Reid Ashinoff, Sandra Hauser, Sonnenschein Nath & Rosenthal, New York, NY, for The Prudential Insurance Company of America.

## OPINION

WOLIN, District Judge.

The settlement process in this matter is essentially complete, with the exception only of some minor follow-up on the last hundred or so claims. Class Counsel have applied for a final award of fees and expenses. For the reasons stated below, the Court will grant that application.

## I. Background

The Court will not review at length the history of this litigation. The facts and procedural history of this case are described in detail in prior opinions of this Court and in the opinion of the Third Circuit. *In re Prudential Ins. Co. of America Sales Practices Litigation,* 962 F.Supp. 450 (D.N.J.1997) (approving settlement as fair, reasonable and adequate); *In re Prudential Ins. Co. of America Sales Practices Litigation,* 962 F.Supp. 572 (D.N.J.1997) (awarding attorneys' fees to Class Counsel); *In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283 (3d Cir.1998) (affirming approval of settlement but vacating fee award and remanding for further consideration), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142

L.Ed.2d 789 (1999). The facts and procedural history that are relevant to the decision on Class Counsel's current motion will be discussed in appropriate context *infra.*

In connection with the settlement of this case, after all other material terms of the settlement had been negotiated, Class Counsel and Prudential agreed that Prudential would pay attorneys' fees and expenses to Class Counsel in an amount approved by the Court in addition to what Prudential was paying to the Class, and that Prudential would not oppose a fee and expense application for up to $90 million. There was no evidence of collusion. 148 F.3d at 335, 962 F.Supp. at 570.[1]

Class Counsel thereafter applied for a lump sum award of $90 million. This Court did not grant that application. Instead, utilizing a percentage-of-the-recovery approach, and a lodestar analysis as a cross-check, the Court created a bifurcated fee structure. The Court awarded Class Counsel an immediate payment of 11% of the $410 million *guaranteed* "Minimum Fund" created by Class Counsel as part of this settlement. That first component comprised $45 million plus expenses. The second component was to depend on the ultimate results of the settlement's alternative dispute resolution ("ADR") process. If at least 330,000 ADR claims were filed by June 1, 1997, Class Counsel would receive the additional $45 million, less previously paid expenses.[2] Pursuant to the

---

1. The Supreme Court has suggested that such agreements should be encouraged as a matter of public policy. *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("A request for attorneys' fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of the fee."). Such agreements particularly should be encouraged where there has been no collusion, fees were not discussed until after the settlement was negotiated, *and* the fees will not reduce the Class fund. *See generally Prandini v. National Tea Co.,* 557 F.2d 1015 (3d Cir.1977); *Court Awarded Attorneys' Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985). Here, Class Counsel presumably sought more than $90 million in their fee negotiations with Prudential, and presumably agreed to the $90 million

figure as a compromise, in order to achieve an agreement that Class Counsel hoped, under the circumstances, would be respected. If such agreements are likely to be subject to further reduction by the Court notwithstanding the absence of any collusion or opportunity for collusion, and notwithstanding the absence of any impact on the class recovery, then future plaintiffs' counsel will have little incentive to make such agreements. Nevertheless, for the reasons described herein, this Court concludes that the requested fee should be approved regardless of the parties' agreement.

2. The reasoning for this was based on actuarial estimates that if 330,000 claims were filed, the total value created would likely exceed $1 billion.

Court's decision, Prudential transferred $48,877,072.53 to Co–Lead Counsel's escrow account on or about March 27, 1997.

A small number of objectors, led by Richard Krell (collectively "the Krell Objectors"), appealed the approval of the settlement and the fee award to the Third Circuit. In an opinion and order dated July 23, 1998, the Third Circuit affirmed this Court's approval of the settlement but vacated the fee award and remanded it for further consideration. 148 F.3d at 284. The Third Circuit agreed with this Court that a fee award consisting of a percentage of the value generated by Class Counsel was warranted. *Id.* at 333–34. However, the Third Circuit sought further development of the record and findings on three issues: (a) the amount of the benefit conferred upon the Class that could properly be attributed to Class Counsel, (b) the appropriate percentage to be applied to that amount in a case of this magnitude, and (c) the appropriate multiple to be used as a cross-check under the lodestar method of calculating fees. *Id.* at 336–41. The Third Circuit also suggested that this Court exercise its discretion to consider whether the Krell Objectors should be granted "limited discovery" on fee issues. *Id.* at 338.

Following the remand, on December 10, 1998, this Court entered an order granting Class Counsel an interim award of $39.5 million in fees and $5.038 million in expenses. The effect of that award was to permit Co–Lead Counsel to begin distributing to plaintiffs' counsel monies from the more than $48 million transferred to Co–Lead Counsel's escrow account by Prudential in March 1997. Plaintiffs' counsel had been working on this matter since 1994, and had achieved excellent results, but had not been paid any fees during that lengthy period of time.

Meanwhile, the Krell Objectors had petitioned the Supreme Court of the United States for *certiorari* with respect to the Third Circuit's opinion. On January 19, 1999, the Supreme Court denied certiorari. *Krell v. Prudential Ins. Co. of America,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999); *Johnson v. Prudential Ins. Co. of America,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). That action by the Supreme Court made the settlement "final" within the meaning of the Stipulation of Settlement. Accordingly, pursuant to the terms of the Stipulation of Settlement, on or about January 27, 1999, Prudential transferred to Co–Lead Counsel's escrow account the balance of the $90 million.

By the Spring of 1999, the parties had learned that the results of the ADR had far exceeded even the most optimistic estimates. As of Spring 1999, a total of approximately 558,500 actual ADR awards had been made to Class Members. Additionally, approximately 503,200 Class Members had received approximately 742,100 actual basic claim relief ("BCR") awards. As a result, on or about March 8, 1999, the Krell Objectors withdrew their opposition to Class Counsel's fee request. At that time, Class Counsel and the Krell Objectors entered into a stipulation in which the Krell Objectors represented that, "based upon this newly available data, the [Krell] Objectors now agree that a fee and expense award, on behalf of all plaintiffs' counsel in the amount of 90 million dollars plus accumulated interest is reasonable."[3] The question of whether "limited discovery" should be afforded to the Krell Objectors thus became moot.

On or about April 15, 1999, Class Counsel filed this Joint Petition, seeking permission to distribute the balance of the $90 million in Co–Lead Counsel's escrow account. The Court has not yet ruled upon that April 1999 petition. By Order dated May 24, 1999, however, the Court ordered an interim fee award of $10 million.

---

**3.** The stipulation was actually denominated as a Stipulation and Order. The Court saw no reason to enter it as an Order, and declined to do so.

In their April 15, 1999 petition, Class Counsel submitted additional evidentiary material in response to the Third Circuit's concerns about the adequacy of the record presented to it on the fee issue. That evidence included numerous documents annexed to the petition, as well as affidavits from Robert L. Hoyer, the managing partner of the Life & Health Actuarial Services Group of Arthur Andersen, LLP; Paul DeAngelo, the chairman of the multistate task force ("MSTF") or ("Task Force"); Christopher A. Seeger, Esq., the policyholder representative in connection with the settlement in *Willson v. New York Life, Inc. Co.*, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup.Ct. July 31, 1995), *aff'd*, 228 A.D.2d 368, 644 N.Y.S.2d 617 (1996) (*"New York Life"*), upon which the Task Force settlement in this case was generally modeled; Kirk E. Chapman, Esq., one of the members of Class Counsel's team in this case with primary responsibility for supervising the activities of the telephone hotline known as the Class Action Remediation Center; and Brad N. Friedman, Esq., who attached to his affidavit the final fee and expense numbers for Class Counsel.

In addition to the above, the Court also is aware that, as stated above, the ADR process is now essentially complete. All of the roughly 645,000 claims that Prudential received have now been scored, and approximately 565,000 of these were offered either intermediate level or highest level relief. This mean that the total value of this Settlement is even greater than the values set forth in the Hoyer Affidavit that was submitted together with the April 1999 petition.

Accordingly, for all of these reasons, a sufficient record is now before the Court. And for the reasons described below, that record amply justifies, and indeed compels, the grant of Class Counsel's application.

## II. Class Counsel's Responsibility For The Result

This Court previously found that Class Counsel had been a material factor in bringing about the entire settlement, including that portion of the value that arose from the MSTF plan to which Prudential agreed in July, 1996. 962 F.Supp. at 581–82. The Third Circuit stated that "[i]t is not clear on the record before us that class counsel had so significant a role in the institution of the Task Force proceedings that the district court was justified in crediting counsel for all of the benefits created under the Task Force plan." 148 F.3d at 337. The current amplified record, however, makes crystal clear that Class Counsel *were* a material factor in creating the relief offered by the Task Force plan, as well as the substantial additional relief created by the settlement of this litigation.

There is no question that this class action litigation preceded the creation of the Task Force. Class representative Carol Nicholson filed suit in state court in Illinois on February 6, 1995. Class representatives Vincent and Elizabeth Kuchas began an action in the United States District Court for the District of Connecticut on February 28, 1995. Class representative Martin Dorfner brought a lawsuit in this district on March 3, 1995. The Task Force did not exist when these lawsuits were filed.

In fact, it is clear that the Task Force began to take shape only in response to these and other cases, in April 1995. On or about April 18, 1995, in a document titled "NAIC TASK FORCE PROPOSAL," Prudential suggested to the New Jersey Department of Banking and Insurance that the Task Force be created. Among the advantages to a regulatory Task Force that Prudential perceived, was that "Prudential is currently a defendant in a number of purported national class action lawsuits, in which Prudential has little choice at this juncture but to respond in an adversarial mode. By contrast, a collaborative approach between this Task Force and Prudential offers the most likely avenue to a prompt, effective and consensual resolution of policyholder problems . . . ." Short-

ly thereafter, in May 1995, the New Jersey Department of Banking and Insurance wrote to each jurisdiction regarding an initial meeting of the Task Force. The letter stated that *"[d]ue to the recent allegations against Prudential Insurance Company of America,* we anticipate that the focus of the Task Force will, at least initially, be Prudential." The regulators themselves, therefore, recognized that this class action litigation was responsible for the creation of the Task Force and formed its focus. So did the Fee Examiner appointed by this Court, Stephen M. Greenberg. *See* Report and Recommendation of Stephen M. Greenberg, Fee Examiner at 11 ("On April 25, 1995, in response to the allegations raised in the several [class action] complaints, the New Jersey Insurance Commissioner formed [the] Multi–State Task Force . . . ."). *See also* Task Force Report adopted July 9, 1996, at 1–2 ("The Task Force was formed . . . in response to widespread allegations of improper sales and marketing activity of life insurers . . . . In the wake of lawsuits and publicity about Prudential, the Task Force's first objective was to review allegations of improper sales practices regarding the company, which is the largest life insurer in the country.").[4]

Prudential's eagerness to organize the Task Force as an alternative to this class action case contrasts dramatically with Prudential's pre-litigation rejection of the idea of working with state regulators to resolve its problems. The November and December 1992 memoranda from James C. Helfrich, who was then the director of Prudential's Consumer Affairs & Marketing Practices Department, detailed some of Prudential's sales practice abuses, including financed insurance (churning) and vanishing premium (abbreviated payment plan) policies. The Helfrich memoranda (which were actually multiple versions of the same memorandum) then suggested a "Possible Solution," under which Pruden-

tial would "consider changing its complaint handling policies and give the customers that for which they bargained." Mr. Helfrich emphasized the need to work jointly with the regulators in this regard:

> The regulators would need to "buy in" to the program. By necessity, this would require us to admit our prior problems.

There was no question that Prudential's top management, including its President, Ron Barbaro, not only received but actually considered and discussed the Helfrich memorandum. That is made clear by Mr. Helfrich's November 18, 1992 cover memo to David Fastenberg, Prudential's Vice–President, District Agencies, that accompanied Mr. Helfrich's November 16, 1992 draft of his memorandum:

> During the CAMPD meeting with Ron Barbaro this morning, a discussion on financed insurance took place. As a result, Mr. Barbaro asked for a memorandum that I had prepared which was still in draft form. A copy is attached herewith.
>
> Please call me at 391–3274 before your meeting with Ron Barbaro this evening since he mentioned that he was going to make it a point to discuss the issue with you and the VPRM's tonight. I would like to fill you in on the details.

Similarly, a memorandum dated December 16, 1992, with a handwritten notation below signed "Dave" (apparently Mr. Fastenberg) and dated January 4, 1993, addressed the December 2, 1992 version of the Helfrich memorandum. The handwritten note states:

> *VP's/DIR*
>
> Please review the proposal, which has tremendous future implications for us. I'd appreciate your feelings on this as soon as possible so I can respond to Helfrich appropriately. Dave.

Yet, even after Prudential's most senior management considered and discussed Helfrich's proposal to "admit our prior

---

**4.** The Task Force has never conducted any similar examination of any other life insurer, either before the Prudential investigation or afterwards.

problems" and get the regulators to "buy in," Prudential rejected the option of working with the regulators. Not until the efforts of Class Counsel produced class action lawsuits against Prudential, did Prudential suggest the creation of the Task Force.

Moreover, Class Counsel were more than just the "initial impetus" for the Task Force. *See* 148 F.3d at 337 ("there must still be a sound basis that [Class Counsel were] more than an initial impetus behind the creation of the benefit"). As the Third Circuit noted, "[a]t least every five years, the New Jersey Department of Banking and Insurance is required to conduct a market conduct examination of Prudential." 148 F.3d at 337. The Prudential market conduct report that most immediately preceded both the creation of the Task Force and the filing of the class actions was a market conduct report issued on June 30, 1994 ("the 1994 Report"), seven months before the first class action was filed, and before the regulators had the benefit of Class Counsel's efforts. That 1994 Report covered the period ending December 31, 1991, which included much of the class period addressed by this litigation. Presumably, material information learned by the regulators during the two and one-half year period between the December 31, 1991 ending date of the report and its issuance on June 30, 1994, also was included in the 1994 Report.

The 1994 Report is 255 pages long. Yet there is no hint in that Report of any of the widespread wrongdoing that Class Counsel exposed in the lawsuits that began only a few months later. On the contrary, the 1994 Report appears to have given Prudential a clean bill of health.

To the all-important issue of "Replacement of Life Insurance," which would consume a substantial part of the Task Force's efforts less than one year after the issuance of the 1994 Report, the 1994 Report devoted only three paragraphs:

The New Jersey Administrative Code N.J.A.C. 11:4–2.5(a)3.i through vii re-

quires that insurers issuing policies to replace existing policies of other companies complete certain actions in order to fulfill the purposes of the replacement regulation. This regulation also requires that replacement records and replacement register [sic], cross indexed by replacing agent and existing insurer to be replaced, be maintained for at least five years or until the conclusion of the next succeeding regular examination by the Insurance Department of its state of domicile, whichever is later.

N.J.A.C. 11:4–2.7(a)3.i and ii require companies whose policies are being replaced to maintain a file containing certain information which must be indexed by replacing insurer and held for five years or until the conclusion of the next regular examination by the Insurance Department of its state of domicile, whichever is later.

A review of the files, including a representative sample of policies that had been replaced, indicated that the Company had complied with the codes.

Similarly, in discussing "Treatment of Policy Holders," the 1994 Report stated, in its entirety:

The Company is in compliance with New Jersey Statute 17B:30–13.2 that requires life insurance companies to maintain a complete record of all the complaints which it [sic] has received since the date of the last examination. A review of complaints selected on a sample basis indicated that the Company resolved complaints promptly. Further comments pertaining to the treatment of policyholders appear in subsequent sections of this report entitled, "Aggregate Reserve for Life Policies and Contracts" and "Policy and Contract Claims–Life".

Finally, the section of the 1994 Report that discussed "Advertising" found "the Company to be in general compliance with [the] Statute with the exception of four print advertisements in 1991 in which reference is made to the 1990 assets with no

mention of the corresponding liabilities." The response of the 1994 Report to these four incidents of non-compliance was a "recommend[ation] that the Company fully conform with New Jersey Statute 17B:18–48 and cease from advertising its assets without advertising the corresponding liabilities."

The contrast between the 1994 Report and the report of the investigation begun by the New Jersey Department of Banking and Insurance in the Spring of 1995, after Class Counsel had come on the scene, is dramatic. That later report, which was issued on July 28, 1996, was prepared in tandem with the Task Force's work and, not surprisingly, as the Third Circuit noted, examined many of the same issues that the Task Force was reviewing. 148 F.3d at 338. The difference in the findings of the 1994 Report, in which the regulators did not have Class Counsel's resources and efforts behind them, and the 1996 report, by which time Class Counsel's efforts had furnished significant evidence to the regulators, illustrates Class Counsel's continuing and substantial contributions, and shows that the 1996 report would not have reached the conclusions that it did absent Class Counsel's work.

From the beginning of the Task Force's existence, Class Counsel sought to assist and invigorate the Task Force. Class Counsel had two meetings early on with certain Task Force members, including Task Force Chair Paul DeAngelo. Class Counsel began that meeting by explaining who Class Counsel were, why their investigation had already led them to conclude that Prudential had engaged in serious misconduct, the reasons that cooperation between the Task Force and Class Counsel made sense, and the resources and experience that Class Counsel could offer the Task Force to assist them to conduct a thorough investigation and create a remedy appropriate to the seriousness of any misconduct.

As the DeAngelo Affidavit states, the Task Force members were very interested in learning the details of the *New York Life* settlement, which had been created by many of the same attorneys who comprised Class Counsel here. Class Counsel spent hours educating the Task Force about the *New York Life* settlement, and in particular, its ADR component. The DeAngelo Affidavit confirms that the *New York Life* settlement eventually became the model that the Task Force used to arrive at the Task Force settlement with Prudential.

In addition to educating the regulators about the class action litigation and the *New York Life* settlement, Class Counsel also exposed the fact that Prudential had failed to produce to the Task Force fundamental documents that Class Counsel had requested in this litigation. Those included such basic materials as: (i) documents generated prior to January 1, 1990; (ii) documents showing how marketing and sales materials and presentations had been developed; (iii) the marketing or sales materials themselves, including illustrations; (iv) uniform marketing training programs; (v) assumptions supporting material provisions and illustrations including dividends, interest rates, and expenses; (vi) actual internal methodologies employed for declaring dividends; (vii) internal projections of investment portfolios, lapses, and surrenders; and (viii) materials used to identify candidates for the "replacement" of policies. After a submission by Class Counsel to this Court in opposition to Prudential's motion to afford primary jurisdiction to the Task Force identified the documents that Prudential had not provided to the MSTF, the Task Force then requested and received most or all of those documents.

Class Counsel also brought about a significant expansion in the MSTF's role compared to what the Task Force originally had contemplated. The Task Force's original view of its mission and the proposed length of its investigation were limited. An "UPDATE" dated August 29, 1995 stated that a draft report would be pre-

pared by December, 1995, with a final report to be issued by the end of the first quarter of 1996. The "[e]nd [r]esult" of the Task Force was not intended to include any discussion of violations of statutes or regulations, according to that "UPDATE." Instead, the Task Force might "make recommendations in universal areas," but did not intend "to include recommendations for fines or penalties." *Id.*

All of that changed once Class Counsel perceived that the Task Force intended to limit its inquiry to the most general level of Prudential's activities. After learning that agents subpoenaed to give testimony before the Task Force had been advised that the Task Force did not intend "to discuss your specific activities with respect to sales you have made[, r]ather, we wish to ask more general questions regarding your knowledge of state and company requirements and from where that knowledge and understanding came . . . .," Class Counsel intensified their own discovery efforts to fill in the details about how Prudential's practices were carried out. Class Counsel began contacting hundreds of Prudential's current and former agents, including persons whose names Class Counsel gathered from sources other than Prudential. From numerous substantive interviews, Class Counsel obtained information in many areas, including agent recruiting, agent training, agent supervision, destruction of documents, and the fraudulent sales practices alleged in the first amended complaint. Class Counsel also obtained hundreds of critical Prudential documents and numerous Prudential audio and videotapes. Those documents included training materials, solicitation materials such as brochures and mailers, internal memoranda, e-mail, correspondence and telephone scripts. *See generally* Affidavit of Melvyn I. Weiss, dated November 22, 1996, ¶¶ 60–74.

Moreover, Class Counsel spoke with hundreds, if not thousands, of Class Members who contacted Class Counsel to complain about their treatment by Prudential.

Class Counsel interviewed many of these persons, and sent questionnaires to others to learn about how Prudential had sold them policies. *Id.,* ¶ 72.

Class Counsel also developed evidence and located key witnesses that the Task Force did not find. Thus, Class Counsel obtained affidavits and the "Sally Edwards memorandum," which showed that documents highly relevant to the claims in this lawsuit had been destroyed. *Id.,* ¶ 73. Similarly, it was Class Counsel who ferreted out the critical Helfrich memoranda. Prudential had withheld those memoranda from the Task Force until at or after the time that the Task Force had supplied Prudential with a draft Task Force report. Class Counsel also uncovered and interviewed John Cressman, a former Prudential Regional Director of Internal Auditing who had developed a system to detect churning as early as 1982 or 1983. Class Counsel discovered that Mr. Cressman's system had resulted in a decrease in churning that caused Prudential's sales to plummet, and that, as a result, he was transferred out of the auditing function and his system was discontinued. *Id.,* ¶ 74.

All of the above and more came to light solely as the result of Class Counsel's efforts. Particularly considering the limited scope that the Task Force originally envisioned for itself, Class Counsel's work had a significant impact on the Task Force's results. Ultimately, the Task Force expended far more time than it had originally intended, included in its report statutory and regulatory violations, and ordered the payment of fines and penalties. As described *supra,* the Task Force had not originally contemplated doing any of that.

Moreover, recognizing the perception in some quarters that the Task Force might be the captive of Prudential, one of New Jersey's largest businesses, Class Counsel created sustained public pressure through statements in this Court and in the press. Class Counsel ensured that, if Prudential hoped that its "collaborative" work with

the Task Force would result in a white-wash, the Task Force would not permit that.

The regulators themselves recognized that what has been labeled as the "Task Force settlement" was, in reality, inextricably intertwined with the settlement achieved by Class Counsel. At a court conference on October 16, 1996, Martin Carus of the New York Department of Insurance observed that because the Task Force had negotiated a "most favored nation" understanding, it was important to conclude an initial "Task Force settlement," so that Class Counsel could then negotiate a settlement much more favorable to policyholders:

> And I knew full well that there was a possibility that signing on to the [Task Force] settlement would do nothing for the class action suit, but that there was a possibility that us doing this, coming to a conclusion in late June or early July would spur some action in terms of the class action suit.
>
> And the negotiations and acceptance of the [Task Force] settlement was predicated in part that, okay, if there was a settlement of the class action suit and it came out better than what we had negotiated, I was going to get that.

October 16, 1996 transcript, at 22–23.

On the basis of the present more complete record, this Court cannot view the Task Force plan as separate from what Class Counsel achieved for the Class. Indeed, shortly after Prudential entered into a memorandum of understanding with Class Counsel, at least one regulator publicized Prudential's admission, in its discussions with the Task Force, that Class Counsel "has a bigger gun than the state regulators." In short, without the resources, resourcefulness and persistence of Class Counsel behind it, the Task Force never would have obtained Prudential's agreement to the "Task Force plan."

Class Counsel therefore is properly viewed as having been a "material factor" in creating the entire value of the settlement, including any component attributable to the Task Force, within the meaning of both *Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897 (3d Cir.1985), and the Third Circuit's prior opinion in this case. *See* 148 F.3d at 336–38.

## III. Total Value of the Settlement, And Minimum Value Attributable to Class Counsel

The Court now turns to the valuation of the settlement, as the Third Circuit directed. Since actual results are now known, there is no longer any need to rely on prognoses.

As of early 1999, Prudential had reserved $2.5 billion to pay for the cost of this settlement, as reported in BestWeek, March 1, 1999. It appears that the actual value of the settlement in fact exceeds that amount. Based on information that describes the results of the ADR scoring process as of early 1999, plaintiffs' expert actuary, Robert L. Hoyer, the managing partner of Arthur Andersen, LLP's Life & Health Actuarial Services Group, opined that the total value of the ADR portion of the settlement exceeds $2.3 billion.[5] Mr. Hoyer arrived at that value by taking actual results, some of which were provided in a March 11, 1999 report prepared for Prudential by Tillinghast–Towers Perrin, and then running those results through the model (adjusted as appropriate) described in his affidavit dated November 21, 1996. As a cross-check, Mr. Hoyer compared his results against the "Final Range of Estimated Average Costs Per Claim" in the Tillinghast report, and multiplied by the number of claims remedied. That cross-check result yields a range from a $2.23 billion to more than $2.35 billion, thus vali-

---

**5.** As previously noted, based on the final data, this turns out to have been conservative. Nevertheless, since these are the values that were supplied by Class Counsel, these are the values that the Court will use for purposes of this Opinion.

dating Mr. Hoyer's analysis and methodology. Moreover, even more recent reports indicate that, as of May 31, 2000, Prudential had issued more than $3.3 billion in relief through the ADR process, consisting of more than $2.75 billion in cash payments, $13 million in restored values, and more than $589 million in premium adjustments.

In any event, Mr. Hoyer then subtracted from his own numbers approximately $246 million, which he had calculated as the value resulting from the activities of the "holdout states," including outreach amendments to the settlement. Thus, the net value of the ADR portion of the settlement for which Class Counsel claimed credit exceeds $2.15 billion.[6] The Court has carefully reviewed Mr. Hoyer's methodology and conclusions about the value of the ADR, and approves them.

Mr. Hoyer has calculated the total value of BCR at more than $150 million. That amount is less than the value that Mr. Hoyer had estimated in November 1996. This appears primarily to be due to the fact that many more Class Members than previously expected opted for the potentially more valuable ADR. When the value of ADR that is to be credited to Class Counsel is added to the worth of the BCR, Class Counsel has created at least $2.3 billion in settlement value.

Moreover, the benefit that Class Counsel created for the Class must also include the requested attorneys' fees and expenses of $90 million; the cost of the unprecedented outreach and other notices, which was previously estimated at $50 million; as

well as the huge administrative expenses of ADR, which have been absorbed entirely by Prudential pursuant to the settlement and were previously estimated at $100 million. Thus, the value of this settlement to class members actually exceeds $2.5 billion.

As discussed above, the expanded record currently before the Court amply reflects that Class Counsel were the central and indispensable factor in bringing about this entire amount of value. Class Counsel also have demonstrated, again through a highly conservative expert analysis by Mr. Hoyer, that even if the Court did not credit Class Counsel with creating the value arising out of the Task Force plan, Class Counsel still created value of approximately $1.8 billion. The Chair of the Task Force, Paul DeAngelo, stated that the Task Force relied heavily on the settlement created by many of the same Class Counsel in *New York Life.* Affidavit of Paul DeAngelo, ¶¶ 4–7. The *New York Life* settlement, however, included more limited outreach, had more difficult ADR scoring criteria, offered lesser ADR relief and, perhaps as a result, generated a "take rate" by class members of only 0.9%. Affidavit of Christopher Seeger, ¶ 7.

Though this 0.9% "take rate" for ADR achieved in *New York Life* would have been an appropriate number to have used in valuing the Task Force's contribution to ADR relief here (since the Task Force similarly did not provide for any substantial outreach), Mr. Hoyer generously assumed a "take rate" of 1.5% for the Task Force plan.[7] Using that and other conser-

---

6. Class Counsel did not seek "credit" for settlement value arising from activities of the states of California, Florida, Massachusetts, Texas and Washington, who had remained outside the Task Force plan and conducted their own outreach programs. Class Counsel might well have done so, since the "holdout states" would not have come together and remained outside the Task Force absent Class Counsel's efforts. *See* Weiss Aff., dated November 27, 1996, ¶ 78. The Court need not and does not express any opinion on that issue.

7. A reasonable argument can be made that a more proper estimate of the expected "take rate" for the Task Force plan would have been 0.375%. Prudential's own "voluntary remediation program," which was undertaken at the behest of the regulators in 1995 and 1996, resulted in participation by only 0.375% of policyholders. Mr. Hoyer's estimate of a 1.5% "take rate" for the Task Force plan, which assumes more than a 400% greater response than that generated by Prudential's voluntary remediation program, reflects the conservative nature of his calculations, and

vative calculations, Mr. Hoyer concludes that, of the total ADR value of more than $2.3 billion, approximately $344 million is attributable to the Task Force plan. After subtracting the $246 million attributable to the "holdout states," the value of the ADR portion of the settlement generated solely by Class Counsel, exclusive of the Task Force and the "holdout states," and employing a conservative methodology, is approximately $1.8 billion.

## IV. The Appropriate Percentage Award

The Third Circuit agreed with this Court that the percentage-of-the-recovery method was an appropriate method for determining Class Counsel's fees in this case. 148 F.3d at 333–34. But the Third Circuit directed that this Court undertake a "more thorough examination and explication of the proper percentage to be awarded to class counsel, in light of the magnitude of the recovery." *Id.* at 340. The Third Circuit concluded that this Court's earlier decision was "unclear in light of the facts and cases it referenced." *Id.* With the benefit of a fuller record, and additional decisions in this area of the law since the Third Circuit issued its opinion, this Court will carry out the Third Circuit's directive.

The Third Circuit approved this Court's "creation of a bifurcated fee structure [as] an appropriate and innovative response to the structure of the settlement, and well within its sound discretion." *Id.* at 334. The basis for the bifurcation was the need to account separately for the $410 million Minimum Fund that was *guaranteed* to be paid to Class Members and the then unquantifiable benefit to Class Members that would result from the ADR and BCR processes. However, now that the results of ADR and BCR are known, the Court need no longer apply the bifurcated analysis of its earlier opinion, but may treat this case as equivalent to any other large class action settlement that generates a benefit with a known value.

further reinforces the Court's conclusion that

Though, as the Third Circuit noted, percentage fee awards "generally decrease as the amount of the recovery increases," 148 F.3d at 339 (citation omitted), there is no automatic correlation. Instead, the quality of Class Counsel's work, the fee percentage that likely would have been negotiated between private parties, and the lodestar cross-check, also may offer some guidance, though perhaps less so in a large case. *Id.; see Prudential,* 962 F.Supp. at 580. As a result, at any given level of recovery, the percentage fee that courts award has varied. *See, e.g., Kurzweil v. Philip Morris Companies,* 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) ($123.8 million settlement fund; 30% fee award); *In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393 (S.D.N.Y.1999) ($116.6 million settlement recovery; 27.5% fee award); *Bowling v. Pfizer, Inc.,* 922 F.Supp. 1261, 1283–84 (S.D.Ohio 1996) ($102.5 million settlement fund; 10% fee award *plus* separate award of up to 10% of all future contributions to settlement fund), *aff'd,* 103 F.3d 128, 1996 WL 724272 (6th Cir.1996), *cert. denied,* 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997); *In re Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) ($170 million settlement; 17.92% fee award); *American Continental Corp./Lincoln Savings & Loan Securities Litigation,* MDL 834 (D Ariz. July 25, 1990) ($255 million settlement; 27% fee award).

While these cases have smaller settlement values than the present case, they illustrate the point that, even at the same level of settlement value, courts may differ in the percentage that may appropriately be awarded. Indeed, the court in *American Continental* awarded the same or even a higher percentage than many of the other cited cases, despite a settlement value approximately two-and-one-half times the others.

Thus it is clear that, while percentage awards *generally* decrease as the amount

those calculations are valid and appropriate.

of the recovery increases, there is no perfect correlation between the appropriate percentage and the size of the recovery. As the Third Circuit recognized, other factors, such as the quality of Class Counsel and other similar factors, including the lodestar cross-check, also come into play in any individual case.

## A. In re NASDAQ

The case most comparable to the present matter is *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465 (S.D.N.Y.1998). That decision was issued after the Third Circuit had rendered its decision in the present case. Like the class in the present case, the *NASDAQ* class was very large, consisting of more than one million investors who had purchased or sold shares of securities on the NASDAQ exchange during a period of more than five years. *Id.* at 470. In November 1998, Judge Robert Sweet approved proposed settlements that required the defendants to pay the class $1.027 billion, which the Court characterized as "the largest antitrust class action recovery to date." *Id.* at 470, 476. Despite the huge size of the recovery, Judge Sweet awarded the class counsel $143.78 million in fees and an additional $4.5 million in expenses, for a percentage award of 14%. *Id.* at 470, 489–90. Though the $1.027 billion settlement benefit in *NASDAQ* was substantially less than the value of the settlement in the present case even under the most conservative methodology, the fees awarded in *NASDAQ* exceed those that Class Counsel seek here by over $50 million. Moreover, while the *NASDAQ* fee award was 14% of the settlement, the fee that Class Counsel seek here is only 3.7% of the Settlement—and even less than that if one bases the value on the more current statistics. Even if Class Counsel were given credit only for what they achieved above and beyond the benefit that might be attributable to the Task Force, the resulting percentage is below 4.8%.

Several different cross-checks confirm that, as measured by *NASDAQ*, Class Counsel's fee request here is eminently reasonable. In *NASDAQ*, the fees represented approximately $143.00 per class member (over 1 million class members and an award of nearly $144 million). Here, the fee per class member is approximately $10.00. Even calculating the per class member fee using only the approximately 1.15 million class members who have elected to receive an ADR or BCR benefit, the fee per class member totals approximately $73.70, barely half of what *NASDAQ* awarded in respect of a similar number of class members.

The lodestar cross-check produces another validation of Class Counsel's fee request here. Class counsel's lodestar in *NASDAQ*, which was $36,191,751.00, resulted in a lodestar multiplier of 3.97. 187 F.R.D. at 489. Here, Class Counsel's total lodestar as of April 1999 is approximately $4 million *more* than the lodestar in *NASDAQ*, which translates into a lodestar multiplier in the present case of less than 2.13.

The comparison with *NASDAQ* is all the more striking because, in that case, attorneys' fees and expenses will reduce the actual cash received by each class member. *Id.* at 472–73. Here, by contrast, the fees and expenses that Class Counsel have sought and that Prudential has agreed to pay will be paid by Prudential in addition to the class recovery, and will not diminish it. If the Court were to reduce Class Counsel's fee, that would not confer a greater benefit on the class, but instead would benefit only Prudential.

Judge Sweet's analysis in *NASDAQ* is persuasive here. Like the Third Circuit, Judge Sweet noted that courts generally "reduce percentage awards as the size of the recovery increases." *Id.* at 486. Indeed, *NASDAQ* recognized that, in "megafund cases," the range of fees awarded is commonly 6–10%. *Id.* Nevertheless, in the circumstances of *NASDAQ*, Judge Sweet decided to award a 14% fee, for the same

reasons that suggest a larger percentage here.

First, Judge Sweet found that the quality of class counsel's representation and the benefits to the class were "exemplary." *Id.* at 487. Similarly here, as recognized both by this Court and the Third Circuit, "class counsel's representation and the results achieved were 'nothing short of remarkable,'" 148 F.3d at 339 (quoting 962 F.Supp. at 585–86).

Second, Judge Sweet considered the "formidable opposition against which the result was achieved." 187 F.R.D. at 488. "The ability of class counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of the petitioners' work." *Id.* Similarly here, this Court has recognized that Prudential's outside and in-house counsel were "formidable" opponents. 962 F.Supp. at 585.

Third, Judge Sweet recognized that the "role of class counsel was critical, not only in achieving the significant recovery, but in framing the issues which became the subject of the later served civil investigative demands of the Antitrust Division of the Department of Justice." 187 F.R.D. at 488. In the present case, as discussed *supra*, Class Counsel played a critical role not only in framing the issues that the Task Force would consider, but in causing the Task Force to be created and in assisting the Task Force with what eventually became the "Task Force plan."

Finally, Judge Sweet considered the element of risk:

> In order to achieve this $1.027 billion settlement, Class Counsel had to, and ultimately did, overcome risks in at least four important areas by: surmounting Defendants' motion to dismiss; certifying a broad … class; developing credible class wide evidence of liability; and developing credible evidence of damages …. There would have been no recovery if Plaintiffs had failed in any of these [four] areas.

187 F.R.D. at 488. Class Counsel here likewise had to overcome each of those four hurdles. None of them was a foregone conclusion. Indeed, comparable class actions against other life insurance companies have been lost in their entirety, or motions for class certification denied.[8]

## B. The Report and Recommendation of Stephen M. Greenberg, Fee Examiner

This Court previously declined to adopt the report and recommendation of the Fee Examiner in this matter, Stephen M. Greenberg, even though the Court characterized that report as "well written and reasoned." The Court declined to adopt the Fee Examiner's report solely "because it [did] not adequately account for the uncertainty of the expert projections of the settlement's value." 962 F.Supp. at 587. Now that the settlement's value is known, so that there is no longer a need to rely on projections, the Court finds persuasive the conclusions of the Fee Examiner on the question of the appropriate percentage:

> The Fee Examiner concluded that, "at the low end of the range of reasonable evaluations of the settlement in this case—$1,299,600,000—the appropriate percentage for an award of attorneys' fees is 8.0%, resulting in a fee of $103,-968,000, excluding expenses; and that at the high end of that range—$2,077,000,-000—the appropriate percentage is 7.0%

---

8. *E.g., In re Northwestern Mutual Life Ins. Co. Sales Practices Litigation,* 1999 WL 825589 (D.N.J. Oct.14, 1999); *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332 (D.Minn. 1999); *Underwood v. Life Ins. Co.,* 14 F.Supp.2d 1266 (N.D.Ala.1998); *Frith v. Guardian Life Ins. Co.,* 9 F.Supp.2d 734 (S.D.Tex.1998); *In re Jackson Nat'l Life Ins. Co. Premium Litigation,* 183 F.R.D. 217 (W.D.Mich.1998); *Russo v. Massachusetts Mutual Life Ins. Co.,* 178 Misc.2d 772, 680 N.Y.S.2d 916 (N.Y.Sup.Ct.1998); *Marks v. Lincoln Nat'l Life Ins. Co.,* No. 98099012/CC2977 (Md. Cir. Ct. Balt. City Sept. 14, 1998), *aff'd,* No. 1739 (Md. Ct. Spec.App. June 7, 1999), *cert. denied,* No. 296 (Md. Sept. 14, 1999).

(decreased somewhat from 8.0% to reflect the higher value of the recovery), resulting in a fee of $145,390,000, excluding expenses. Under either evaluation, the requested award—$90 million to cover fees and expenses—is within the ambit of these permissible percentages."

962 F.Supp. at 587 (quoting Fee Examiner's report at 67–68).

### C. The Appropriate Percentage

For purposes of selecting the appropriate percentage award in this case, the Court will use the most conservative evaluation of the benefit generated by Class Counsel—$1.8 billion—that indisputably, under even the most conservative view, was not the result of the Task Force. At that level of benefit, as suggested by the Fee Examiner's report, the Court concludes that, absent the parties' earlier agreement, the appropriate percentage would be 7.5%. That percentage is just over half of the 14% fee awarded in *NAS-DAQ*, in which the settlement value also was over $1 billion. In the circumstances in this case, a 7.5% fee—were it to be awarded—would in no way represent an unearned windfall to Class Counsel.[9]

In addition to the fact that the quality of Class Counsel's work product was high, Class Counsel persisted and ultimately succeeded against extraordinary difficulty, and over opposition not only from Prudential but from within the ranks of plaintiffs themselves, most particularly the Krell Objectors. In addition to having to defeat a formidable motion to dismiss, 975 F.Supp. 584 (D.N.J.1996), Class Counsel had to fight for the very right to unearth the facts underlying Prudential's conduct. After the Court imposed a stay on formal discovery, Class Counsel turned to an extensive, virtually unprecedented program of informal interviews of thousands of Prudential personnel and policyholders across the country. When Prudential attempted to block that innovative inquiry as well, Class Counsel were required to obtain from this Court a landmark decision regarding the scope of RPC 4.2. *In re Prudential Ins. Co. of America Sales Practices Litigation*, 911 F.Supp. 148 (D.N.J. 1995). Thereafter, Class Counsel brought to light evidence that Prudential had failed to preserve documents that were critical to this litigation, which resulted in a separate investigation of document destruction and, ultimately, a $1 million sanction against Prudential. *In re Prudential Ins. Co. of America Sales Practices Litigation*, 169 F.R.D. 598 (D.N.J.1997).

Even in the time since the settlement in this matter was finally approved, Class Counsel have continued to remain actively involved in the matter, including, among other things, zealously representing the interests of policyholder class members in the ADR process. Most recently, the Court charged Class Counsel with conducting an investigation into allegations that Prudential had sabotaged the ADR process. In short, Class Counsel had to overcome numerous substantiative and procedural hurdles not present in the normal class action case. In these circumstances, a 7.5% fee award, had such an award been requested, would have been amply justified.

The Third Circuit questioned the appropriateness of this Court's previous blended 6.7% award in light of two cases in which the percentage awarded was lower than 6.7% despite the smaller value of those settlements, and a third case in which the fee award was only slightly higher. *In re Baldwin–United Corp. Litigation*, 1986 WL 12195 (S.D.N.Y.1986) ($183.8 billion settlement fund; attorneys' fee of 4.1%); *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985) ($180 million settlement fund; 5.5% award); *In re MGM Grand Hotel Fire Litigation*, 660 F.Supp. 522 (D.Nev.1987)

---

9. The Court will not award 7.5%. Instead, as described herein, the Court will limit Class

Counsel to their agreement with Prudential.

($205 million settlement; 7% fee award). 148 F.3d at 339 & n. 118. In the context of this Court's fuller analysis, *Baldwin–United, Agent Orange* and *MGM Grand* do not undermine the Court's determination that 7.5% would be an appropriate percentage fee here.

In *Baldwin–United,* the 4.1% fee mentioned by the Third Circuit in its prior *Prudential* opinion was merely an *interim* fee award. 1986 WL 12195, *1, *5. Not all of the related class actions before the court had been settled, and the court wished to wait until the end of the litigation before assessing the *risk multiplier* that counsel deserved. *Id.,* *4. In a later decision, class counsel were awarded an *additional* fee of nearly $3 million. *Baldwin–United,* slip op. at 7 (S.D.N.Y. July 31, 1987). The total fee on the $183.8 million dollar settlement fund was approximately $10.475 million, which results in a percentage of approximately 5.7%, not 4.1%.

More importantly, *Baldwin–United* used the lodestar method rather than the percentage-of-recovery method in awarding the fee. The interim fee represented a multiplier of 2.0, 1986 WL 12195, *4, quite comparable to the 2.13 multiplier requested by Class Counsel in the present case. The multiplier on the total fee was 2.8, which exceeds the multiplier that Class Counsel seek here. Thus, viewing *Baldwin–United* through the lens of the fee method that the Court actually employed, *Baldwin–United* supports the award that Class Counsel seek here.

The fee award in *Agent Orange* also was awarded on a lodestar basis rather than a percentage of the recovery (unlike in the present case). Moreover, the court's lodestar analysis was based upon a *now* dated view of then *nationally* prevailing hourly rates—which is not the law in this Circuit—which resulted in the court crediting associate time at only $100 per hour, law school professors at only $125 per hour, and partners at only $150 per hour, with certain awards subject to positive or nega-

tive multipliers for the quality of the representation involved. Despite all of that, the *Agent Orange* award resulted in a percentage of 5.5%, not substantially lower than the 7.5% that the Court finds would be appropriate here, given the extraordinary quality of Class Counsel's work and the prodigious determination and creativity that was required to overcome the obstacles to success in the present case. *Compare Sumitomo Copper,* 74 F.Supp.2d at 394 (27.5% award where plaintiffs' counsel had to review millions of documents and overcome stiff resistance from defendants).

In *MGM Grand,* there were two groups of plaintiffs' counsel. One was the Plaintiffs' Legal Committee and the other consisted of individual attorneys for individual plaintiffs. The court in *MGM Grand* awarded a 7% fee to the Plaintiffs' Legal Committee only. The total award to both groups of counsel was up to 33–1/3%, not merely the 7% awarded to the Plaintiffs' Legal Committee. 660 F.Supp. at 524. Thus, the 7% fee mentioned by the Third Circuit does not in fact reflect the full percentage award on the $205 million settlement fund in *MGM Grand.*

Moreover, the lodestar multiplier in *MGM Grand* for the Plaintiffs' Legal Committee lawyers alone was 2.04. 660 F.Supp. at 530 (total lodestar was $7,050,-871). That is approximately the same multiplier that Class Counsel will receive here since the multiplier as of April 1999 was 2.13. *MGM Grand, Baldwin–United* and *Agent Orange* do not counsel against the 7.5% fee that the Court would consider appropriate.

Here, Class Counsel seek far less than 7.5%. Their request—at most only 4.8%—is eminently appropriate and will be approved.

## V. Lodestar Cross–Check

The Third Circuit recognized that "[c]ourts apply multipliers to lodestar calculations for various reasons. Multipliers

may reflect the risk of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result." 148 F.3d at 340. Here, all three of those factors support the award of a lodestar multiplier.

As discussed *supra*, Class Counsel undertook extraordinary risk. Many comparable insurance sales practices cases and class actions either have failed on the merits or resulted in denials of class certification. *See supra* at n. 8. In ruling on Prudential's motion to dismiss, this Court expressed "considerable doubt as to [the] ultimate merits" even of those claims that it did not dismiss outright. 975 F.Supp. at 591. Class Counsel's decision to take on the world's largest insurance company, and its highly qualified and sophisticated team of inside and outside counsel, represents the type of substantial risk that warrants a multiplier.

The social benefit of this litigation also is undisputed. Millions of Class Members, many of them elderly and in poor health, were victimized by fraudulent and misleading sales practices. Without attorneys such as Class Counsel risking their own time and resources in the hope of an eventual recovery, most of those policyholders would receive no recompense at all. Indeed, this Court concluded, and the Third Circuit agreed, that a class action was the superior method of adjudication in this case precisely because individual actions were unrealistic given the relatively small but significant amount of damage to each individual person and the substantial cost of litigating against a defendant such as Prudential. 148 F.3d at 316 (citing and quoting 962 F.Supp. at 523–25). The social benefit of the litigation, which has resulted in a multi-billion dollar recovery for policyholders, and which presents a cautionary tale to other insurance companies that engaged in similar improper sales practices, cannot be doubted.

Finally, a multiplier is appropriate here to "reward counsel for an extraordinary result." 148 F.3d at 340. As noted *supra*,

the Third Circuit agreed with this Court's conclusion that "the results achieved were 'nothing short of remarkable.'" 148 F.3d at 339 (quoting 962 F.Supp. at 585–86).

The Third Circuit recognized that "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." 148 F.3d at 341 (quoting 3 H. Newberg & A. Conte, *Newberg on Class Actions*, § 14.03 at 14–15). The Third Circuit questioned the use of the 5.1 multiplier that would have resulted as of the date of this Court's previous opinion. *Id.* at 340. However, since that time, as a result of the continuing and extensive efforts by Class Counsel on behalf of policyholders, so much additional time has been required to be expended that the lodestar as of April 1999 approximates 2.13. Indeed, given the circumstances of this insurance sales practices case, with the huge risk that Class Counsel undertook, the immense difficulties that they had to overcome, and the extraordinary result that they achieved, a far higher multiplier might be justified if this were a lodestar rather than a percentage case. *See, e.g., Weiss v. Mercedes-Benz of North America, Inc.,* 66 F.3d 314 (3d Cir.1995), *aff'g,* 899 F.Supp. 1297, 1304 (D.N.J.1995) (approving multiplier of 9.3).

For all of these reasons, the lodestar cross-check validates the Court's decision on the appropriate percentage fee. Class Counsel's request will be granted.

## VI. Discovery As To Fees

As noted *supra*, the Third Circuit directed this Court to "reconsider permitting discovery [by the Krell Objectors] on the benefits to the class secured by class counsel." 148 F.3d at 342. Since that time, however, the Krell Objectors have dropped their opposition to Class Counsel's fee request. In fact, based on the extent of the relief that Class Counsel have actually obtained for the Class, "the [Krell] Objectors now agree that a fee and expense award, on behalf of all plaintiffs' counsel, in the amount of $90 million plus accumulated interest, is reasonable." Accordingly, the question of discovery is now moot.

## VII. Conclusion

For the reasons expressed above, the Court will award plaintiffs' counsel an amount of attorneys' fees and expenses equal to the remainder of the $90 million that Prudential agreed to pay and has paid, in escrow, to Class Counsel. This amounts to $35.462 million ($90 million less the previous payments of $44.583 million and $10 million), plus accrued interest.

An appropriate order is attached.

## ORDER & JUDGMENT

In accordance with the Court's Opinion filed herewith,

It is on this 18th day of July, 2000,

**ORDERED** that plaintiffs' counsels' fee petition is granted. Plaintiffs' counsel may draw from Co–Lead Counsel's escrow account an amount of attorneys' fees and expenses equal to the remainder of the $90 million that Prudential agreed to pay and has paid—$35.462 million—together with any interest that has accrued on those funds.

SO ORDERED.