**In re CENDANT CORPORATION SECURITIES LITIGATION**

No. CIV. 98–1664(WHW).

United States District Court,
D. New Jersey.

Aug. 16, 2000.

Dennis J. Block, Cadwalader, Wickersham & Taft, New York City.

James E. Lyons, Thomas Stevens, Skadden, Aps, Slate, Meagher & Flom, LLP, San Francisco, CA.

Carl Greenberg, Budd Larner Gross Rosenbaum Greenberg & Sade P.C., Short Hills, NJ.

Steven S. Radin, Mattew S. Hawkins, Sills Cummis Radin Tischan Epstein & Gross, Newark, NJ.

Greg A. Danilow, Weil, Gothshal & Manges LLP, New York City.

Richard J. Schaeffer, Dornbhush Mensch Mandelstam & Schaeffer, New York City.

Donald A. Robinson, Robinson Lapidus & Livelli, Newark, NJ.

Gary P. Naftalis, Kramer Levin Naftalis & Frankel, New York City.

Samuel Kadet, Skadden, Arps, Slattes, Meagher & Flom LLP, New York City.

Herbert Jay Stern, Stephen M. Greenberg, Stern & Greenberg, Roseland, NJ.

James G. Kreissman, Jacob S. Pultman, Simpson Thacther & Barlett, New York City.

Dennis P. Orr, Mayer Brown & Platt, New York City.

Douglas S. Eakeley, Lowenstein Sandler PC, Roseland, NJ.

Alan N. Salpeter, Caryn L. Jacobs, Mayer, Brown & Platt, Chicago, IL.

Robert G. Cohen, William P. Hammer, Jr., Ernst & Young LLP, New York City.

James M. Altman, George B. Yankwitt, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City.

William F. Maderer, Saiber Schlesinger Staz & Goldstein, Newark, NJ.

Helen Gradd, Daniel E. Reynolds, Lankler Siffert & Wohl LLP, New York City.

Thomas G. Griggs, Edwards & Caldwell, Hawthorne, NJ.

Ronald L. Bernstein Gretchen Baumgardner, Douglas W. Greene, Perkins Coie LLP, Seattle, WA.

Daniel J. Beller, Paul, Weiss, Rifkind, Wharton & Garrison, New York City.

Max W. Berger, Daniel L. Berger, Jeffrey N. Leibell, Bernstein Litowitz Berger & Grossmann LLP, New York City.

Charles H. Landesman, Kearney, NJ.

I. Walton Bader, Bader and Bader, White Plains, NY.

James N. Benedict, Clifford Chance Rogers & Wells, New York City.

Robert J. Fettweis, Roth & Fettweis, Newark, NJ.

Edward J. Dauber, Greenberg Dauber Epstein & Tucker, Newark, NJ.

Eric Tunis, Orange, NJ.

James A. Plaisted, Walder Sondak & Brogan, P.A., Roseland, NJ.

Henry D. Gradstein, Joel M. Kozberg, Eileen M. Cohn, Gradstein, Luskin & Van Dalsem, P.C., Los Angeles, CA.

James C. Gulotta, Jr., Stone, Pigman, Walther, Whittman & Mutchinson, New Orleans, LA.

Margaret E. Haering, Hurwitz & Sagarin, LLC, Milford, CT.

Michael J. Pucillo, Burt & Pucillo, West Palm Beach, FL.

George Vuoso, Gordon, Altman, Butkowsky, Weitzen, New York City.

Bruce E. Gerstein, Barry S. Taus, Brett Cebulash, Garwin, Bronzaft, Gerstein & Fisher, New York City.

David M. Taus, Francis J. Devito, P.A., Hackensack, NJ.

Elwood S. Simon, John P. Zuccarini, Elwood S. Simon & Associates, P.C., Birmingham, MI.

Michael H. Schaalman, Paul D. Bauer, Quarles & Brady LLP, Milwaukee, WI.

D.Greg Durbin, McCormick Barstow Sheppard Wayte & Carruth LLP, Fresno, CA.

James Moyle Clifford, Chance Rogers & Wells, New York City.

Gerald J. Rodeos, Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, PA.

Robert A. Hoffman, Barrack, Rodoes & Bacine, Haddonfield, NJ.

Seth R. Lesser, Bernstein Litowitz, Berger & Grossman, Hackensack, NJ.

Joel M. Leifer, Joel M. Leifer & Associates, New York City.

Arthur N. Abbey, Jill S. Abrams, Abbey, Gardy & Squitieri, LLP, New York City.

Allyn Z. Lite, Joseph J. DePalma, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ.

Andrew L. Barroway, Schiffrin Craig & Barroway, LLP, Bala Cynwyd, PA.

Joseph Sacca, Jonathan J. Lerner, Skadden, Arps, Slates, Meagher & Flom, New York City.

Lisa C. Cohen, Schindler Cohen & Hochman, New York City.

Jonathan D. Thier, Cahill Gordon & Reindel, New York City.

Andrew R. Jacobs, Michael E. Coslet, Fitzsimmons Ringle & Jacobs, P.C., Newark, NJ.

Melvin Brosterman, Lawrence Greenwald, Stroock Stroock & Lavan, LLP, New York City.

David Sorokoff, Deloitte & Touche, New York City.

James J. McGuire, White & Case, New York City.

Richard L. Klein, Wilkie Farr & Gallagher, New York City.

Thomas G. Shapiro, Shapiro, Iiaber & Urmer, Boston, MA.

Myron D. Rumeld, Proskauer Rose LLP, New York City.

Steven Pontell, Verde Steinberg & Pontell, Fort Lee, NJ.

Howard Sirota, Sirota & Sirota, New York City.

Gerald Palmer, Ricky Shackelford, Jones Day, Los Angeles, CA.

C.Benjamin Nutley, Kendrick & Nutley, San Diego, CA.

Stuart Wechsler, New York City.

Paul Rothstein, Gainesville, FL.

Lawrence Schonbrun, Berkeley, CA.

Corporation Counsel City of N.Y. Law Dept., New York City.

WALLS, District Judge.

Lead Counsel, the law firms of Bernstein Litowitz Berger & Grossman LLP ("BLBG") and Barrack, Rodos & Bacine ("BRB"), petition the Court for an award of attorneys' fees in the amount of 8.275% of the total settlement fund (after deducting costs and expenses of litigation); a total fee award of $262,468,857. One of three co-Lead Plaintiffs, the New York City Pension Fund ("NYCPF"), and three other class members object to the request. The requested fee is awarded and expenses in the amount of $14,623,806 are allowed.

## A. Background

On April 15, 1998, Cendant announced that it had discovered accounting irregularities in a former CUC business unit and that Cendant's financial statements for 1997, and possibly earlier years, would be restated. Thereafter, a number of purchasers of Cendant securities filed class actions against Cendant and other defendants. On May 29, 1998, this Court consolidated all of the actions then pending against Cendant under *In re Cendant Corporation [Securities] Litigation,* Civ. No. 98–1664(WHW).

On August 4, 1998, the Court appointed the New York State Common Retirement Fund ("NYSCRF"), the California Public Employees' Retirement System ("CalPERS"), and NYCPF as co-Lead Plaintiffs for the class action against Cendant Corporation filed by those who held Cendant stock other than PRIDES, another form of security issued by Cendant.

At that time, this Court announced the procedure it would use to select lead counsel to represent the plaintiff class. The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77k, 77*l*, 77z–1,

77z–2, 78j–1, 78t, 78u, 78u–4, & 78u–5, attempts to protect the plaintiff class to ensure that total attorneys' fees and expenses awarded by a court to counsel for the plaintiff class do not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class. 15 U.S.C. §§ 77z–1(a)(6); § 78u–4(a)(6). To implement the objectives of the PSLRA, this Court determined that the selection of counsel should be the subject of competitive, adversarial bidding. *In re Cendant Corp. Litig.,* 182 F.R.D. 144 (D.N.J.1998).

The Court invited any attorney who wanted to be lead counsel for the class of shareholders excluding the PRIDES-holders to submit a sealed bid to the Court.[1] Fifteen law firms from around the country submitted twelve separate bids which, among other requirements, described their professional qualifications and ability to undertake and maintain all costs of the litigation. The Court reserved the right to reject any bid which it deemed not to have been made in good faith or which was contrary to the interests of either plaintiff class. *Id.* Recognizing that the PSLRA gives Lead Plaintiffs the statutory opportunity to choose their counsel, subject to Court approval, the Court gave Lead Plaintiffs' original counsel the right of first refusal: if plaintiffs' original counsel was qualified and had not submitted the lowest qualified bid, it would be given the opportunity to agree to the terms of what the Court had found to be the lowest qualified bid. Bidders BLBG and BRB, the original counsel for co-Lead Plaintiffs, exercised that right and accepted the terms and fee bid schedule which the Court had determined to be the lowest qualified bid to represent the class. On October 13, 1998, the Court appointed BLBG and BRB as Lead Counsel for the class.

Lead Counsel assert that the 8.275% request "adheres precisely to the market-established fee grid, which the Court de-

1. Those who wanted to be Lead Counsel to     PRIDES holders made separate bids.

termined was the lowest qualified bid." Lead Counsel seek fees under the second column of the fee grid, because settlement was reached during discovery—after motions to dismiss and before the summary judgment stage. They further seek the sum of $14,623,806 (plus interest) as reimbursement of costs and expenses incurred during prosecution. The amount includes a $13,208,151 fee of Lazard Frères & Co., an investment banking firm hired by Lead Counsel for its expertise; $271,560 charged by the damages expert, Forensic Economics, Inc.; $349,881 to compensate an accounting firm, Marks Paneth & Schron LLP; $250,000 to another investment banking expert, Arthur S. Ainsberg; and $528,812 in law firm expenses.

### B. Lead Counsel's Analysis of Fees in Large Class Actions

Lead Counsel state "[t]he Supreme Court has ... consistently held that the percentage [of settlement fund] approach is the correct method for determining attorneys' fees in common fund cases." LC Brf. at 9 (citing *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). They rely, in part, on the conclusions of a report issued by the Third Circuit Task Force which analyzed court-awarded attorneys' fees (the "Task Force Report"). *See Court–Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255–56 (Oct. 8, 1985). That report criticized the lodestar method of awarding fees and recommended:

> that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement

agreeable to the Bench and to plaintiff's counsel. . . .

In 1995, the Third Circuit expressly determined that a percentage of recovery approach was the most appropriate method of fee calculation in common fund cases. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 332 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).[2] Courts approve of the percentage recovery fee award because it "more accurately reflects the economics of litigation practice" and is "result-oriented." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C.Cir.1993).

Importantly, Congress, by the PSLRA, adopted the percentage of recovery method. 15 U.S.C. § 78u–4(a)(6) states: "Total attorneys' fees and expenses awarded by the court to counsel shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." This admonition was recognized by this Court at the time it adopted the auction process—"To seek the *requisite reasonableness* of costs for such talent which is to be borne by the entire plaintiff's group in this case in the event of recovery, it is my judgment that legal fees also be the subject of adversarial competition." Transcript of August 4, 1998 Hearing at 109–114 (emphasis added).

Lead Counsel ask the Court to adhere to the bid resulting from the auction. They quote from the transcript of the August 4, 1998 Hearing and the Court's "auction opinions" issued September 8, 1998 and October 2, 1998. Then the Court said that the lowest qualified bid would be the "benchmark of reasonableness" for determining an eventual award of fees. As to

---

2. In *In re Prudential*, the Third Circuit affirmed approval of the settlement but vacated the fee award and remanded for further consideration. While Lead Counsel's fee request

was before this Court, the district court issued a new fee opinion, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F.Supp.2d 721 (D.N.J.2000).

lodestar, the Court declared "under no circumstances will I permit lodestar to be used in this litigation." Tr. at 26. It continued, "I have known people who, given a problem, could solve it in 45 minutes. Whereas I might take two hours. And some other person might take two and a half hours. And in that sense I'm an elitist because I feel as though the person who is able to settle the case, settle the problem in 40 minutes should not be penalized." Tr. at 44–45. This reasoning was later clarified at the fairness hearing of June 28, 2000. *See* Fairness Hearing Tr. at 143 (June 28, 2000), *quoted in* n.9.

The "lowest qualified bid," determined by the Court, provides for fees ranging from 2%–9% of recovery. As the recovery rises, the fee percentage increases. Lead Counsel support this methodology and refer to Professor John C. Coffee, Jr.'s declaration submitted to the Court in August 1998:

> My point is that the first dollars in any settlement are easy, while the marginal dollars become progressively harder. An optimal fee formula should reward the attorney for working harder and gaining more for the class. This does not mean that the attorneys will necessarily receive more money. A fee formula that starts low (at 5% to 10% and ascends to 25%) may produce the same (or lesser) compensation as one that starts at 25% and then descends to 5%—but it will clearly work better to discourage "cheap" early settlements....

Coffee Decl. at ¶ 18. Lead Counsel further assert that the structure adopted by auction should not now be "renegotiated."

Lead Counsel argue that irrespective of the auction process, 8.275% of the recovery, net of expenses, is reasonable in relation to other awards in class action cases. The *General Motors* court noted that "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund." 55 F.3d at 822. Counsel also surveyed fees awarded by judges within the districts of the Third Circuit which rou-

tinely were between 30–35% of the settlement. Brf. at 23–24, 23 n.8. A study by the National Economic Research Associates ("NERA") done in 1994, and updated in 1996, concluded "[r]egardless of case size, fees average 32 percent of the settlement. This finding holds even for cases with settlements in excess of $50 million." *See* Denise Martin et al., National Econ. Research Ass'n, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* 10–11 (NERA 1996).

Lead Counsel focus first on fees awarded in larger securities class actions—cases where the class recoveries ranged from $62–$220 million. Awards for these cases ranged from a low of 20% in the case with a $200 million recovery to a high of 33.3% for cases with recoveries of $77.5 million and $110 million. Brf. at 24–25 (chart).

They also survey recoveries in what they label "mega-fund" cases—billion dollar plus recoveries: *In re NASDAQ Market–Makers Antitrust Litigation,* 187 F.R.D. 465 (S.D.N.Y.1998) ($1.027 billion recovery); *Shaw v. Toshiba America Information Systems, Inc.,* 91 F.Supp.2d 942 (E.D.Tex.2000) (estimated $1.1 billion); and various cases against tobacco companies brought by certain states ($17.3 billion in Texas, $13 billion in Florida, and $4 billion in Mississippi). The *NASDAQ* fee was 14%, plus expenses of the recovery; the *Toshiba* fee was approximately 15% of recovery; five firms litigating in Texas on behalf of the state against the tobacco industry will receive 19% of the state's recovery; eleven firms in Florida will receive approximately 25% of the recovery; and thirteen firms in Mississippi, 35% of the recovery. The *Toshiba* court noted that in "mega-fund cases, where recoveries are very large, fees in the neighborhood of fifteen percent (15%) are common." 91 F.Supp.2d at 989.

As additional support that the fee is justified, counsel rely on many of the arguments offered in favor of settlement—such

as the risks of establishing liability and damages and other *Girsh* factors. *See* Companion Opinion, No. 98–1664, slip. op. at 34–49 (D.N.J. August 2000) (evaluating settlement).

### C.  Objectors:

#### NYC

Co–Lead Plaintiff, NYCPF ("the city"), objects to the fee request. This objection arises from events of June 1998. The fund alleges that during that month, it, together with co-Lead Plaintiffs CalPERS and NYSCRF, entered into a detailed retainer agreement with BLBG and BRB. The fourth section of that agreement contains a fee grid. Fees were based on a percentage of the amount recovered with the fee percentage decreasing as the recovery increased. The percentages set in this agreement were maximum awards or "fee caps": "The fee will be a function of both the timing and size of the recovery but, *unless agreed to by the Funds, will, in no event exceed the following:* ..." Retainer at 2 (emphasis added). The agreement further states: "In any event [Lead Counsel] will not submit any fee application to the Court without the prior approval of the Funds...." Retainer at 2.

At the hearing on August 4, 1998, Max Berger of BLBG referenced the retainer agreement to argue that Lead Plaintiffs rightly and responsibly selected BLBG and BRB as counsel—"not only did they [plaintiffs] engage in an extensive process in the selection of best counsel ... but in addition, your Honor, have negotiated the best fee probably ever negotiated in advance .... the hardest bargain ever driven in a security fraud class action case." Tr. at 8, 12. On August 4, the three funds were appointed co-Lead Plaintiffs and the auction was instituted. The Court stated "[s]uch [auction] will probably result in reduced costs for the entire group or groups." Tr. at 110. (The city now ar-

gues that the anticipated "reduced costs" were not realized but rather resulted in "an increased cost to the class of $76 million." Brf. at 5.)

According to the city, "Lead Plaintiffs were extremely disturbed by [the auction]" and "even discussed pulling out of the case." Pugh Decl. at ¶ 15. The city now argues that it wrote to the Court on August 17, 1998 to suggest "several considerations that we believe are crucial to obtaining the best representation at the lowest price." Letter at 1. In a footnote they added "we recommend that any numbers/percentages in the grid be established as fee caps only, with the actual fee subject to approval by Lead Plaintiffs before submission to the Court."

As noted, BLBG and BRB, although bidders, were not the lowest bidders, but agreed to match the lowest bid of a qualified bidder.[3] The city has since reviewed the bids placed and maintains that "[i]t does not appear that lead counsel bid the same percentages as the mileposts it had agreed to in the Retainer." Brf. at 6; Pugh Decl. ¶¶ 10, 19. It is clear that the city's fee grid decreased the percentage-of-recovery allocated as fees as the recovery increased, while the auction-set fee increases with the size of recovery. The city now alleges that post-auction it made an off-the-record objection to the use of the Court's fee schedule because of the existing retainer agreement. Pugh. Decl. ¶ 19. "To the best of Mr. Pugh's [the Assistant Corporation Counsel, City of New York] recollection, the Court agreed that the Retainer was in full force and effect except as to the grid for which the results of the auction would take precedence. The Court acknowledged that the grid represented a cap." Brf. at 7. The Court denies that recollection of Mr. Pugh. When asked by Mr. Pugh, who, with others, was walking out of chambers at the time, if the auction bid prevented Lead Plaintiffs from negotiating a lower fee in the future, the

---

**3.** It should be recorded that BLBG and BRB's fee grid submitted as their auction bid was not identical to the fee grid set in the retainer agreement.

Court remarked "go ahead, if you can." (And Mr. Pugh never reported back to the Court.) That is altogether different from Court approval of a retainer agreement made before the auction, the details of which had not been revealed.

The city now asks the Court to reject the fee sought and set a "reasonable" fee; or to hold an evidentiary hearing to determine the appropriate fee; or to reinstate the retainer agreement and ask Lead Counsel to negotiate a fee with Lead Plaintiffs pursuant to the terms of the retainer.

The city states that it agrees with the percentage-of-recovery fee method of fee calculation but argues that *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283, 334 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999), limits the acceptable percentage. There, the Third Circuit reversed an award of 6.7% of an approximately $1.352 billion settlement and remanded the fee determination to the district court judge to "set forth a reasoned basis and conclusion regarding the proper percentage applicable in this case . . . in light of the magnitude of recovery." 148 F.3d at 340. The city cites the *Prudential* district court, which noted that "percentage awards generally decrease as the amount of the recovery increases." *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 572, 580 (D.N.J.1997), *vacated and remanded*, 148 F.3d 283 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). On appeal, the Third Circuit agreed with this premise, but "question[ed] whether the 'reduction' implemented adequately adjusted the fee in relation to the size of the settlement." 148 F.3d at 339. The Circuit Court found that the 6.7% fee represented a higher percentage of recovery than fees in cases with smaller recoveries examined by the trial court—for example a 4.1% fee with a recovery of $183.8 million (*In re Baldwin–United*); a 5.5% fee of $180 million (*Agent Orange*); and 7% of a $205 million settlement (*MGM Grand*). *See id.* at 339 n. 118 (citing cases).

The city also claims that lodestar must be used as a "cross-check" on the reasonableness of a percentage fee in common fund cases. It contends that Lead Counsel's lodestar indicates that an 8.275% recovery is clearly unreasonable. Here, according to the city, the requested fee is 32.7 times lodestar or $10,861 per hour. "The highest multiplier the City Pension Funds have been able to find in the Third Circuit is 9.3 times lodestar." Brf. at 14 (citing *In re Prudential*, 148 F.3d at 340 (referencing *Weiss v. Mercedes–Benz*, 66 F.3d 314 (3d Cir.1995))). (Time records through December 31, 1999 show that counsel had spent 20,208 hours, a $6,701,557 lodestar. Lead Counsel now estimate that to date lodestar is approximately $8 million.[4])

The city contends that such a high fee award/lodestar multiplier is also unreasonable where, as here, "[l]iability . . . was a foregone conclusion." They cite to the (recently unsealed) bid opinion of October 1998 which states: "Basic liability in this case has been conceded by the major corporate defendant. No one needs to be reminded that it was Cendant's public admission on April 15, 1998 that spawned this litigation." *In re Cendant Corp. Litig.*, 191 F.R.D. 387 (D.N.J.1998). Scrutiny of this case, argues the city, "reveals no justification for an enhancement of attorneys' fees in light of the low contingency risk in this case." Brf. at 16. Moreover, the city attributes at least some of the recovery not to counsel but to experts' input for which the class will pay dearly. *See In re Oracle Securities Litig.*, 136

---

**4.** Conversely, according to the city, "[s]hould the Court honor the Retainer negotiated by Lead Plaintiffs and lead counsel, and should lead plaintiff opt not to consider the retainer grid fees as a cap, lead counsel would realize a fee of $186 million. This is 23.2 times lodestar or $7710 per hour."

F.R.D. 639, 644 (N.D.Cal.1991); Pugh Decl. ¶ 22.

The city then argues that the results of the auction are not set in stone: "There is nothing in the Court's orders that requires lead counsel to apply for fees in accordance with the Court's auction grid and we would have expected our attorneys to honor the terms of the Retainer and to have sought our approval before submitting their fee application." *See* 182 F.R.D. at 152 ( "The auction will not obviate the Court's final review of fees and costs pursuant to Rule 23(e).").

The city addresses the auction process. "[A]nother way of looking at the Court's non-binding auction is to view it as a process to determine which counsel will work for the lowest fee; and not as establishing precisely what that fee will be. As it turned out, the counsel chosen by lead plaintiffs agreed to work at the fee determined by the Court to be the 'lowest' fee. We now know that the 'lowest' fee is that specified in the Retainer."

Finally, the city argues that the auction was an unnecessary intrusion into the rights and duties of Lead Plaintiffs under the PSLRA. The PSLRA specifies that the party "most capable of adequately representing the interests of class members" should serve as Lead Plaintiff. 15 U.S.C. §§ 77z–1(a)(3)(B)(i), 78u–4(a)(3)(B)(i). Usually this means the party or parties with the largest financial stake in the litigation. §§ 77z–1(a)(3)(B)(iii)(I)(bb), 78u–4(a)(3)(B)(iii)(I)(bb). The act further provides that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." §§ 77z–1(a)(3)(B)(v); 78u–4(a)(3)(B)(v). The city reads this to mean that "the only time lead counsel's right to choose class counsel should be interfered with is when the court deems that choice adverse to the interests of the plaintiff class." *See In re Milestone Scientific Securities Litig.*, 187 F.R.D. 165, 176 (D.N.J. 1999). Here, it asserts, it had already selected counsel in a competitive manner,

thus the Court had no right to intervene. In fact, Lead Plaintiffs signed the retainer agreement with BRB and BLBG after conducting their own bidding process. Moreover, the retainer agreement safeguarded the rights of plaintiffs by mandating that Lead Plaintiffs pre-approve all fee requests.

In conclusion, "[b]y substituting an auction and its own fee grid, the court, in effect, nullified lead plaintiffs arm's-length negotiations .... [i]n doing so the Court not only unnecessarily interfered with lead plaintiff's attorney-client relationship with lead counsel ... but ran counter to the policies at the heart of the Reform Act."

*Aboff/Sirota*

The Joanne A. Aboff Family Trust ("the trust"), represented by the law firm of Sirota & Sirota LLP, objects to the fee request on the grounds that "it is grossly excessive and seeks unprecedented compensation."

First, the trust argues that the settlement documents do not contained sufficient information regarding the lodestar figure—"based on the information provided, class members have no way to compare the fee with the amount of work actually performed since the number of hours worked was not stated in the [Settlement] Notice or in the fee application." (The trust estimates that the fee sought is 33 times lodestar.)

Second, the trust contends that it should have been provided with information on competing bids in order to make an informed objection to the fee request.

Third, the trust argues that the fee is "excessive" and "outrageous." The trust cites to *In re Prudential* that percentage of recovery fee awards should *decrease* as the size of the recovery increases. 148 F.3d at 339. Here the percentage increases with the recovery. For many of the same reasons presented by the city, the trust states that 8.275% is far above other mega-fund recoveries.

The trust further argues that once the fee request is cross-checked against lodestar, the "magnitude of the windfall sought by lead counsel becomes clear." Aboff Brf. at 9.

*Schonbrun*

Lawrence Schonbrun objects to the fee request on behalf of his 80–year–old aunt. He asks that before awarding attorneys' fees, the Court (1) require class counsel to file their complete time records and (2) appoint a legal auditor to review the records. Schon. Brf. at 2. He remarks that Professor Coffee, one of plaintiffs' experts, recommends that lodestar records be part of the evidentiary record of all fee determinations, even where a percentage-of-recovery approach is used.

He also takes issue with the statement in the Notice of Settlement that the fee requested "is well below the 25–33% that is customarily sought" as misleading. According to him, many large-fund cases award fees below 30%. He further asks the Court to consider the concept of economies of scale inherent in class actions with many plaintiffs—"Obviously it is not 10 times as difficult to prepare, try, or settle, a $10 million case as it is to try a $1 million case." *In re Union Carbide Corp. Consumer Prods. Bus. Securities Litig.*, 724 F.Supp. 160 (S.D.N.Y.1989). He, like the city and the Aboff trust, relies heavily on the Third Circuit's *In re Prudential* decision.

*Throenle*

This objector relies primarily on the argument that, compared to lodestar, Lead Counsel's fee represents a "windfall."

## D. Response

Lead Counsel respond to the objections first by stating "[e]ach of the fee objectors asks this Court to conduct precisely the type of *post hoc* fee determination that the Court sought to avoid in setting a percentage-based fee at the outset of the case." Fee Reply at 3. They then address two arguments common to all objectors: (1) given the recovery in the case, the percentage sought is "excessive" and (2) the Court should employ a lodestar "cross-check" to evaluate the reasonableness of the fee request.

Lead Counsel refer to arguments presented in their initial brief, now supported by the declarations of Professors John C. Coffee, Jr., Arthur R. Miller (Reporter for the Third Circuit Task Force on Court–Awarded Attorneys' Fees) and Samuel Issacharoff. Counsel maintain that the requested fee is reasonable compared to other fees awarded in large class action settlements, particularly securities settlements. The NERA[5] study, for example, found that total fees and expenses awarded in securities class cases averaged 34.74% of settlement amounts. *See* Coffee Decl. ¶¶ 20–23; Miller Decl. ¶¶ 41–44. An additional study by the Law and Economics Consulting Center conducted between 1993 and 1996 found that average fee awards to counsel in securities cases was 32% of recovery. *See* Coffee Decl. ¶ 27 (citing Vincent E. O'Brien, *A Study of Class Action Securities Fraud Cases*). Lead Counsel also cite one of the most recent large securities class action settlement in this circuit, *In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166 (E.D.Pa.2000). There, Judge Katz approved a 30% fee on a $111 million partial settlement and had the following to say about the size of the fee:

It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage. Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no

5. NERA acted as Cendant Corporation's damages expert during litigation.

recovery. Nor does it give sufficient weight to the fact that "large attorneys' fees serve to motivate capable counsel to undertake these actions."

*Id.* at 196. Judge Katz also distinguished the unapproved fee request of 6.7% in *In re Prudential,* a case heavily relied on by objectors here:

> *In re Prudential* does not require a contrary result. The district court there awarded $90 million in attorneys' fees on a settlement estimated to be worth more than $1 billion. While the Third Circuit's decision reversing this award did note that larger settlements usually receive smaller attorneys' fees percentages, much of its concern was case specific. In particular, the court questioned such a large fee when much of the settlement resulted from a Task Force and the work of state regulators. *See In re Prudential,* 148 F.3d at 342.

*Id.* at 205 n. 35; *see also* Miller Decl. ¶ 50.

Lead Counsel contend that there is no merit to the objectors' arguments that the fee should be reduced based on lodestar evaluation. They maintain that injecting lodestar at this stage would result in an unnecessary "renegotiation" of the counsel fee. *See* Miller Decl. ¶ 45; Task Force Rep., 108 F.R.D. at 257–258 ("By establishing the fee agreement early in the litigation, any and all inducement or inclination to increase the number of Lindy [lodestar] hours will be reduced, *since the amount of work performed will not be permitted to alter the contingent fee.*"). Lead Counsel stress that a lodestar cross-check is not mandatory, as suggested by some objectors, but rather is used where a percentage recovery is not set in advance and the Court has qualms about the settlement's valuation (*General Motors* ) or counsel's contribution to the total recovery (*In re Prudential* ). Coffee Decl. ¶¶ 37–39.

Professors Coffee and Miller also criticize the policies behind lodestar-based fee analyses. Professor Miller states the a pre-determined fee gives the attorney "an incentive to press for the best recovery for the class" as early as possible. Miller Decl. ¶ 51–54. As discussed by the Third Circuit Task Force, lodestar: (1) wastes judicial resources on billable hour calculations; (2) creates a risk of inflated billings; (3) increases conflict between attorney and client; and (4) maximizes unpredictability. *See generally* 108 F.R.D. at 246–49; Miller Decl. ¶¶ 34–38.

Professor Coffee premises his argument on then Judge, now Chief Judge Posner's theory that:

> The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is *to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible.* In other words *the object is to simulate the market where a direct market determination is infeasible.* ...
> A recent study finds that "the federal courts appear to have applied, at least implicitly, principles parallel to the market's in determining and awarding attorney fees" in class actions. William J. Lynk, "The Courts and the Market: An Economic Analysis of Contingent Fees in Class–Action Litigation," 19 J. Legal Stud. 247, 260 (1990).

*In re Continental Illinois Securities Litig.,* 962 F.2d 566, 572 (7th Cir.1992) (emphases added).

Professor Coffee builds on this analysis: "By definition, the successful bidder has already offered the lowest price in a competitive market; thus to further reduce its return will frequently be to impose a below-market, uneconomic price on it that it would not have accepted in advance." Decl. at ¶ 43. He adds that the lodestar analysis and the market-based analysis are "fundamentally antithetical." While the auction approach is a market mechanism that works *ex ante* to induce competing teams of attorneys to charge the lowest fee that will return them an acceptable profit, the lodestar formula is an *ex post* mechanism of judicial review.

Counsel next justify this Court's imposition of a fee grid that provides for an increasing percentage of recovery as the size of the recovery increases as opposed to setting a decreasing percentage. Aboff and the city suggest that the decreasing fee grid is preferable.

Lead Counsel respond that the increased percentage "properly incentivized" them to seek the largest recovery possible. Professor Issacharoff adds "[in] every settlement, it is always the easiest dollars that come first." He adds that the American Bar Association Rules ("ABA Rules") allow percentages to remain constant or increase as the recovery grows:

> [M]any would say that this [increasing percentage] form of contingent fee agreement more closely rewards the effort and ability the lawyer brings to the engagement than does a straight percentage fee arrangement, since everyone would agree that it is the last dollars ... of recovery that require the greatest effort and/or ability on the part of the lawyer.

ABA, *Formal Opinion 94–389* § J; *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L.Rev. 669, 725–26 (1986) (suggesting "the use of an increasing percentage of the recovery fee formula"). Judge Katz, in *Ikon*, while awarding a flat percentage recovery of 30%, also criticized decreasing percentage scales:

> [T]he court is well aware that most decisions addressing similar settlement amounts have adopted some variant of a sliding fee scale, by which counsel is awarded ever diminishing percentages of ever increasing common funds. This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements.

*In re Ikon*, 194 F.R.D. at 196.

Lead Counsel state that objectors' reliance on cases which use or suggest decreasing fee percentages, *see In re First Fidelity Bancorp. Sec. Litig.*, 750 F.Supp. 160 (D.N.J.1990) (Sarokin, J.), ignores the overriding concept of using fee scales *set in advance*, regardless of the percentage scale: "The percentage of recovery should be *negotiated and fixed* while the risks and amount of recovery are still unknown." *Id.* at 163 (emphasis added).

Lead Counsel recognize "[w]hile the outcome of the auction was designed to serve as the benchmark of reasonableness for counsel's fee request, the auction does not obviate the Court's final review of fees and costs pursuant to Rule 23(e) and or 15 U.S.C. § 77z–1(a)(6)." *See In re Cendant Corp. Litig.*, 182 F.R.D. 144, 151 (D.N.J. 1998). Here they suggest no reason to deviate from the "benchmark" set by auction, (1) no part of the recovery can be attributed to the efforts of others, as in *In re Prudential;* (2) counsel have negotiated a guaranteed cash recovery, *cf. General Motors;* (3) counsel have acted only in the best interests of the class; (4) the auction was entirely fair—no collusion among bidders occurred; and (5) deviating from the auction to make a *post hoc* determination of reasonableness will affect future auctions: "deviating from the fee grid for the reasons postulated by objectors would cause prospective class counsel to alter their bidding strategies and, in the end, disserve the classes that such auctions are meant to protect."

### E. Responses to Specific Objectors

#### Aboff

Lead Counsel argue that the Aboff trust's objections should be disregarded in light of its counsel's prior involvement in the case. First, Aboff's counsel wrote to the Court in June 1998 and offered to represent the class for a fee "not to exceed 15% of the first $100 million and 10% of any amount recovered in excess of $100 million plus costs." Second, that same counsel, by letter dated June 15, 1998, approved of an auction process. He wrote,

"[a] court employing competitive bidding will not be presented with the oft-derided Herculean task of retrospectively setting 'fair' compensation for class counsel" and added "a determination of attorneys' fees after the resolution of litigation disserves the class."

In the interests of completeness, this Court must disclose that Mr. Sirota's original offer of a 10%–15% fee was replaced by his auction bid which ranged between 1% and 2% of recovery, and rejected by the Court because Sirota's proposed fee schedule was "unrealistic and against the interests of the class." [6]  And because "the circumstance of [the firm] having accused a lead plaintiff of wrongdoing, if not criminal activity" might present an ethical problem.[7]  *In re Cendant Corp. Litig.,* 191 F.R.D. 387, 391 (D.N.J.1998).

Lead Counsel also reply to the trust's objections to the adequacy of notice: lodestar need not be required in a settlement notice, the PSLRA only requires a statement of the fees and expenses sought by

**6.** In detail:

It does not appear that this bidder has a history of actual trial litigation, although it has obtained significant settlements for its clients.  The Court accepts counsel's representation that it would post a performance bond in any amount which the Court directs.  The proposed fee schedule, which begins at 1% and escalates to 2% in the event of a $500 million settlement during the discovery period, and a flat 2% for settlement in any amount during trial activity, is not, upon examination, professionally sound.  One must view this "magnanimous" offer against the realities of the cost of litigation, the deployment and commitment of experienced counsel and support personnel of several firms, and the required expenses and expenditures associated with such commitment.  Unless the eventual monetary recovery in this case is in the billions, such an apparently "cheap" fee schedule does not make professional sense.  In addition, this quasi-philanthropic effort does not auger well as a realistic incentive to pursue a determined resolution of the plaintiffs' cause.  The Court is constrained to conclude that the bid schedule is unrealistic and against the interests of the class. . . . .

counsel and an explanation in support of the application.  15 U.S.C. §§ 77z–1(a)(7)(C), 78u–4(a)(7)(C).  Nor does the objector provide support for its allegation that losing bids should have been disclosed in the notice.

That said, because Aboff's objections echo those of the other objectors, the Court will discuss them below.

*The City*

Lead Counsel argue that the City's own submissions and the text of the retainer agreement demonstrate that the fee set at auction should stand:

● Roger Pugh's declaration, ¶ 19, concedes that the city was informed that the Retainer Agreement "was in full force and effect *except as to the grid, for which [the Court] would substitute the results of the court auction."*

● Only after the proposed settlement was negotiated (Fall 1999) did the city seek to re-impose the fee terms of the Retainer Agreement on Lead Counsel.

191 F.R.D. at 391.

**7.** In September 1998, Aboff's counsel charged:

that counsel for the CalPERS group had made substantial contributions to the campaign of the New York State Comptroller, who, as sole trustee of the [New York State Common Retirement Fund], has substantial influence over the decisions of the fund.  This, they argued, created an appearance of impropriety because the contributions may have played a role in the selection of the group's counsel—a practice known as "pay-to-play."

*In re Cendant Corp. Litig.,* 182 F.R.D. 144, 148–149 (D.N.J.1998).  When asked to present any proof of this alleged wrongdoing—"put up or shut up"—they admitted they could not, and the allegation was dismissed by the Court.  *Id.* at 149.  In October 1998, the Court noted:

that among the factors which disqualified one bidder was the circumstance of its having accused a lead plaintiff of wrongdoing, if not criminal activity.  Under those circumstances, it would be contrary to good practice and ethically dubious to permit that bidder to serve as lead counsel to that plaintiff.

191 F.R.D. at 391.

Goodman Decl. ¶ 3. It was at this time that it became clear that because of the extraordinary recovery that Lead Counsel had obtained for the Class, the fee under the Court's grid exceeded the fee that would have been allowed under the retainer agreement.

- The city failed to seek any appellate review of the bid process or the fee set by auction. Professors Coffee and Issacharoff opine that this is because the city anticipated a settlement only in the low $1 billion range, which would have resulted in a *higher* fee under the retainer agreement than the auction grid. For support, Professor Issacharoff (¶ 40) relies on a November 1998 e-mail sent by City Counsel Roger Pugh to Class Counsel which suggested they aim for a recovery of $1.2–1.3 billion, half stock half cash. (A recovery below $1.2 million results in a lower fee under the auction grid; a recovery above that amount yields a lower fee under the retainer agreement.)
- The city admits that it "underestimated the possible recovery," Pugh Decl. ¶ 21, and "only in hindsight do we know that the Court's grid did not produce the lowest fee structure." Pugh Decl. ¶ 23.
- Only the city, out of three co-Lead Plaintiffs, opposes the fee. The Retainer Agreement provided that the prosecution was to proceed "on an equal basis." Professor Coffee hypothesizes that this phrase established a joint venture, where decisions are controlled by the majority. Here, two out of three do not object. Coffee Decl. ¶¶ 72–77.

### F. Analysis of Fee Request and Objections

Before analysis of the fee and objections, the Court notes the updated status of *In re Prudential,* relied upon by both Lead Counsel and objectors. The Third Circuit had vacated and remanded the fee request to the district court after it rejected the 6.7% fee—or, at the time, $90 million. *See* 148 F.3d 283 (3d Cir.1998). On remand, Judge Wolin addressed the changed circumstances of the case and reiterated approval of a $90 million fee award. *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 106 F.Supp.2d 721 (D.N.J.2000). In doing so, he found that the recovery was due in large part to efforts of class counsel and not to the work of a related state task force examining Prudential's sales practices. *See id.* at 733–34.

### The Fee

To iterate, the fee sought represents 8.275% of the net class action settlement (expenses deducted) or approximately $262 million.

Following established Third Circuit law and the directive of the PSLRA, the Court will award fees by a percentage-of-recovery method. *See In re Prudential,* 148 F.3d at 333–34; *General Motors,* 55 F.3d at 822; *In re Prudential,* 2000 WL 1009691, at *10; Task Force Report 108 F.R.D. at 255–56; *see also* 15 U.S.C. §§ 77z–1(a)(6), 78u–4(a)(6) ("Total attorneys' fees and expenses awarded ... shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.").

To evaluate the fee requires a valuation of the benefit to the class. *See In re Prudential,* 148 F.3d at 333–34 (requiring the court to make a "reasonable estimate" of the settlement's value). This Court wrote when evaluating the settlement:

> Before proceeding to the *Girsh* factors, *General Motors* directs the Court to determine the value of the settlement to the class. The element of uncertainty in the valuation of the Cendant settlement is the contingent payments to the class by Cendant and the HFS directors from any recovery against E & Y. The Court previously refused to rule the HFS contribution "illusory" or "de minimis" but placed no concrete value on it. In their

action against E & Y, the HFS directors claim losses of over $1 billion. Lead Plaintiffs state that these two potential contributions "may prove significant given the extent of damages Cendant and the Individual HFS Defendants are seeking to recover against E & Y." The Court recognizes that this recovery is inchoate but once again affirms that it is not "illusory." This does not mean that valuation is impossible, but only difficult. Because of this difficulty, the Court used a total settlement amount of $3,186,500.00.[8] *See* Settlement Opinion, slip. op. at 33–34 (citations omitted). This value will similarly be used to evaluate the fee request. From this amount, the requested expenses of $14,623,806, *see* Section G below, are deducted, leaving a settlement valued at $3,171,876,194. *See In re Cendant,* 182 F.R.D. at 151 ("Bidders shall indicate how costs are to be deducted").

The Court must then determine what portion of this recovery should be allocated to the efforts of class counsel. *See In re Prudential,* 148 F.3d at 335–38; *see also In re Prudential,* 2000 WL 1009691, at *3. New York City is the only objector to intimate that other factors contributed to the recovery. The city suggests that both the efforts of Lead Plaintiffs and experts hired by Lead Counsel also contributed to class recovery. Pugh Decl. ¶¶ 14, 19; City Brf. at 8, 17–18 ("The results achieved in this case were a function of the efforts of others in addition to lead attorneys") (citing *In re Oracle Securities Litig.,* 136 F.R.D. 639, 644 (N.D.Cal.1991)). *In re Oracle,* however, was concerned with the imposition of a cap on expenses to prevent their being a proxy for attorney efforts. The city's reliance on *Oracle* is misplaced because it does not object to requested expenses. It seems instead that the city objects to the traditional use of experts by counsel. The Court finds that argument to be unjustified. Are not experts expected to assist counsel? That is their time-

honored purpose in any litigation, whether inter alia, contract, products liability, intellectual property or securities fraud matters.

▓ Nevertheless, the Court cannot award counsel a percentage of the full recovery unless their efforts were "a material factor in bringing about the entire settlement." *In re Prudential,* 2000 WL 1009691, at *2; *In re Prudential,* 148 F.3d at 336–38 ("[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed.").

Unlike *In re Prudential,* where the Third Circuit opined that a portion of the settlement may have been brought about by a state task force rather than class counsel's efforts, there is no other catalyst for the present settlement than the work of Lead Counsel. *See In re Prudential,* 148 F.3d at 338. It was Lead Counsel who hired, supervised and worked with the investment banking and accounting experts to whose efforts the city now attributes part of the settlement amount. The city's other alleged catalyst is the work done by itself and co-lead plaintiffs. (This argument was advanced by the city's counsel at the fairness hearing.) Lead Plaintiffs' efforts, however, were those of any other responsible lead plaintiff with a significant stake in the litigation. *See* 15 U.S.C. §§ 77z–1(a)(3)(B)(iii), 78u–4(a)(3)(B)(iii) (presumption that lead plaintiff in securities action "has the largest financial interest in the relief sought by the class"). This Court will not countenance what amounts to an automatic reduction in attorneys' fees merely because Lead Counsel represented attentive clients. This Court, and no other judicial officer, has maintained direct supervision over the parties from the outset of litigation to the present time. In addition to necessary motion practice, the parties regularly met with and reported to the Court every five or six

---

8. Lead Counsel do not seek fees on the benefit to the class conferred by corporate gover-

nance changes negotiated as a settlement provision.

weeks during this period about the status of negotiations between them. At no time did New York City (or anyone else) represent to the Court that the city was doing (or had done) anything to effect settlement: its demonstrated role has always been that of client—an interested one— but still a client. Consequently, the Court has no reason to attribute a portion of the Cendant settlement to others' efforts; Lead Counsel were the only relevant material factors for the settlement they directly negotiated.

### Appropriate Percentage

■ The Court looks to a number of factors to evaluate whether the fee requested is an appropriate percentage of recovery. First is "what the market pays in similar cases." *In re RJR Nabisco, Inc. Securities Litig.*, No. 88–7905, 1992 WL 210138, at *7 (S.D.N.Y.); *see also In re Continental Ill. Securities Litig.*, 962 F.2d 566, 572 (7th Cir.1992) ("The object in awarding a reasonable attorney's fee ... is to simulate the market"); *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir.1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate'"); *Toshiba*, 91 F.Supp.2d at 964–65 (citing *Continental* and the Third Circuit's task force report on attorneys' fees).

Here this Court need not speculate as to what fee percentage the relevant market would have set for a case of this size. No "simulation" of the market is necessary when the open legal market has actually defined the lowest responsible fee: 8.275% of the settlement. Twelve auction bids, most from law firms national in practice and prominent in the field, reflected the force of market activity to determine appropriate costs. The lowest qualified bid is the result of that market competition. Such result will be accorded weight by this Court as a "benchmark of reasonableness" where a large number of firms, some fifteen—many national in practice and reputation—bid to provide legal services to the class. In the absence of demonstrated collusion, or even a hint of it, among these bidders, the Court has no reluctance to accept and find the auction's lowest qualified bid as representative of the market.

Another factor considered is the quality of representation, a shorthand reference to "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon*, 194 F.R.D. at 194 (citing *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 322 (D.N.J.1998)).

The quality of result, measured by the size of settlement, is very high. *See, e.g., In re NASDAQ*, 187 F.R.D. at 487. The Cendant settlement amount alone is over three times larger than the next largest recovery achieved to date in a class action case for violations of the securities laws, and approximately ten times greater than any recovery in a class action case involving fraudulent financial statements. *See generally In re Ikon*, 194 F.R.D. at 194 (settlement of $111 million "is one of the largest, if not the largest, securities fraud settlement in this district [E.D. Pa.]."). The E & Y settlement is the largest amount ever paid by an accounting firm in a securities class action. The Court also notes that New York City, the fee objector with the largest Cendant holdings, calls the settlement amount a "spectacular number," "substantially more than the parties had anticipated." City Brf. at 11, 8.

Counsel also faced risks of establishing liability and damages against all parties. These risks are discussed in detail in the companion opinion assessing the settlement. They include: establishing liability for Section 10(b) violations against all settling parties, especially E & Y; establishing liability for Section 11 violations against all defendants with due diligence defenses; apportioning liability among Cendant, E & Y, the 28 individual defen-

dants, and other non-defendants; and establishing the amount of damages in the aggregate. *See* Companion Opinion, 109 F.Supp.2d 235, 259–62 (D.N.J. 2000).

The settlement was achieved expeditiously, within the one-year unofficial deadline suggested by this Court when it met with all counsel after Lead Counsel had been appointed. Also, Lead Counsel negotiated this settlement in the face of the government's attempt to stay the entire civil action.

Finally, "the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel" were and are high in this action. Lead Counsel are experienced securities litigators who ably prosecuted the action: submitted an amended class action complaint, defended the complaint against motions to dismiss, certified the class, noticed the class of pendency of the action, conducted official and unofficial discovery, negotiated settlement, hired and supervised experts, and have defended the settlement. Similarly, defense counsel lived up to their established reputations and vigorously defended their respective clients. As Judge Katz observed in *Ikon:*

> Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate.... This cooperation enabled the parties to focus their disputes on issues that mattered most and to avoid pointless bickering over more minor matters.

*Id.* at 194.

Another method of analysis looks to fees awarded in similar cases. Judge Katz wrote "[a] recent Third Circuit discussion suggested that very large recoveries have generally yielded fees from 4.1 percent to 17.92 percent, but the cases cited in that decision were all decided at least thirteen years ago." He instead followed a more recent analysis of mega-fund recoveries contained in the *Toshiba* decision. 91 F.Supp.2d at 972. The *Toshiba* summary reveals "that awards of fifteen percent (15%) of the recovery or more are frequently awarded in [mega-fund] cases." *Id.* (listing fee awards in cases between 1993 and 1999).

The Court does not find compelling reliance on *In re Prudential* to support an argument that mega-fund fees "ought to be" between 4 and 6% of recovery. *In re Prudential* has been appropriately distinguished by Lead Counsel: When decided by the Third Circuit, both the aggregate recovery and the amount of recovery attributable to class counsel's efforts were unknown. 148 F.3d at 336–40. And there had been no court-conducted auction at the outset of that litigation.

Instead, this Court is impressed by the surveys of securities class action settlements; Third Circuit settlements, particularly *Ikon;* and mega-fund settlements contained in Lead Counsel's supporting papers. Securities settlements average 32% of settlement, *see, e.g., Recent Trends IV: What Explains Filings and Settlements in Shareholder and Class Actions, supra,* at 7; settlements in the Third Circuit between 30% and 35% of settlement, *see, e.g.,* cases cited in Lead Counsel's Brf. at 23 & 23 n.8; and mega-fund settlements range from the low of 4.1%—the lodestar-based award in *In re Baldwin–United Corp. Litig.,* 1986 WL 12195, cited by the Third Circuit in *In re Prudential*—to the 35% accorded to tobacco firms in Mississippi (of $4 billion settlement). The Court accepts *Toshiba*'s conclusion that fee awards in mega-fund settlements, while below those of conventional class action settlements, fall "in the neighborhood of

fifteen percent." *Toshiba*, 91 F.Supp.2d at 972, 989.

This Court finds from the factors considered—(1) the fee set by the "market"; (2) the quality of result and representation; and (3) awards in other settlements—8.275% to be an appropriate and reasonable request.

*Cross–Check*

■ Traditionally, the "appropriate" percentage is then subjected to a cross-check. *See General Motors*, 55 F.3d at 820. This takes the form of a lodestar analysis to determine whether the contemplated fee is reasonable in comparison to the hours expended on the case. *Id.* The Court finds no need to do this.

Another, more accurate and more realistic benchmark of reasonability exists—the fee set by competitive bids in the Court's September 1998 auction. Chief Judge Posner has written, "The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation .... the object is to simulate the market." *In re Continental*, 962 F.2d at 572. The paragon of reasonableness is the lowest qualified fee available on the open market. The auction process embodies this concept by moving the market-based analysis from the theoretical to the actual. *See In re Cendant Corp. Litig.*, 182 F.R.D. 144, 150 (D.N.J.1998) ("[T]he most effective way to establish reasonable attorney fees is through marketplace (which this Court terms, adversarial) competition."). The winner (whose bid was matched by Lead Counsel) "has already offered the lowest price [for his or her services] in a competitive market." *See* Coffee Decl. at ¶ 43. Absent circum-

stances of bid collusion, bad faith, inadequate numbers of qualified bidders or some other infirmity in the auction process, no cross-check is warranted.

To reduce the fee award set by auction would be antithetical to the Task Force's recommendation that a fee agreement be reached early in the litigation and not later re-adjusted once recovery is known. 108 F.R.D. at 257–58 ("the amount of work performed will not be permitted to alter the [pre-determined] contingent fee"). Such is consistent with this Court's reasoning that attorneys should not be rewarded for taking longer to solve a problem nor penalized for expending shorter time.[9]

Recently, the Third Circuit repeated its approval of pre-determined fees. *See Gunter v. Ridgewood Energy Corp.*, 2000 WL 1038142, at *11 n. 6 (3d Cir. July 27, 2000) (Becker, J.) ("We note that the district courts can avoid many of the complications associated with fee awards by setting fee guidelines and ground rules early in the litigation process. Such ground rules may include: developing means of record keeping that facilitate judicial review.... Another approach is for the district court to determine the fee arrangement *in advance through competitive bidding*. This device appears to have worked well, and we commend it to district judges within this circuit for their consideration." (citing, inter alia, *In re Cendant* ) (emphasis added)); *see also In re Cendant Corp. Litig.*, 182 F.R.D. 144, 151 (D.N.J.1998) ("The Court need not be compelled to learn by hindsight—to be told at the end of months or years of litigation, 'this is what we seek for services rendered.' ").

---

9.  *The Court:* The point is this, I said something months ago which I'm afraid, I hope, when I said it I regretted that I said it that way upon reflection. I take it back to an extent. I said in discussing something similar, I said something along the lines that if it took a smart person 45 minutes to do something and it took me two hours to do it and it took somebody else two and a half

hours, I said something about ... be[ing] an elitist to say I have no problems with the person who did it in 45 minutes. He or she should be rewarded. And the more I think about it I misspoke. It's not a question of elitism. Not at all. It's just a question of recognition of talent.
Fairness Hearing Tr. at 143 (June 28, 2000).

Consequently, this Court will not adjust the pre-set fee award nor will it abandon this approach because the fee scale used provided for an increasing, rather than decreasing, percentage of settlement. In the past, certain courts have operated on the assumption that "economies of scale" warrant reducing fee awards as the size of a recovery increases. *See, e.g., In re Prudential,* 148 F.3d at 339. As stated by the Third Circuit: "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Id.; see also In re NASDAQ,* 187 F.R.D. at 486 ("It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case."). It is respectfully suggested that this analysis fails to account for the fact that, realistically, the first dollars offered in settlement are the simplest to achieve; the difficulty lies in getting a defendant to increase its initial offer. *E.g.,* ABA, *Formal Opinion 94–389* § J ("it is the last dollars ... of recovery that require the greatest effort and/or ability on the part of the lawyer"). Moreover, the increase in fee percentage as recovery increases was designed to stimulate counsel to strive for ever-increasing recovery. *See In re Cendant Corp. Litig.,* 191 F.R.D. 387, 390 (D.N.J.1998) (the chosen bidder's fee schedule should "represent[ ] a realistic incentive to pursue a determined resolution of the plaintiffs' cause at a reasonable cost"); *see also id.* (lowest qualified bid, bidder 9 of 12, "represents a fee calculated to engender and maintain counsel's pursuit of the optimum recovery for the plaintiffs"). The amount of settlement here surprised all of the class, including present objectors. The Court is also unwilling to sanction "economies of scale" timidity. Rather, the Court is of like mind with Judge Katz's pragmatic observations:

> [T]he court is well aware that most decisions addressing similar settlement amounts have adopted some variant of a sliding fee scale, by which counsel is awarded ever diminishing percentages of ever increasing common funds. This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements. More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizeable. *It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount,* even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage.

*In re Ikon,* 194 F.R.D. at 196 (emphasis added).

To repeat, this Court finds no need whatsoever to ignore or modify the "benchmark of reasonableness"—the September 1998 auction result. Not one objection was made then to the actual process, the number and quality of the bidders, their bids, and the Court-specified conditions. True, New York City comes now to object to the legal underpinnings of the auction—but does not challenge the breadth and quality of those who participated in it.

### The City

The Court, in September 1998, decided that under the PSLRA, the Court is charged with ensuring that Lead Plaintiff is capable of pursuing the class's claims with vigor and that qualified counsel is chosen who will charge "the best rates for the class." *See In re Cendant Corp. Litig.,* 182 F.R.D. 144, 145–46, 150–52 (D.N.J. 1998) (citing 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I) (lead plaintiff presumption is rebuttable) & § 77z–1(a)(3)(B)(v) (selection of counsel subject to court approval)). The Court therefore set an auction framework for determining the lowest attorneys fees obtainable in the Cendant action. As

of the auction, the city was on notice that the "lowest qualified bidder" determined by the Court would be appointed Lead Counsel, unless counsel previously chosen by the co-Lead Plaintiffs "matched" the bid. Neither the city nor other co-Lead Plaintiffs raised an objection to that ruling when issued even after the Court allegedly informed the city that the auction results would supersede any other previous fee arrangement. *See* Pugh Decl. at ¶ 19 (retainer agreement would be "in full force and effect *except as to the [fee] grid, for which [the Court] would substitute the results of the court auction* ").

The city now appears as a fee objector. Its other co-Lead Plaintiffs, the New York State Common Retirement Fund and the California Public Employees' Retirement System, make no objection. The city argues that given the $3.1 billion recovery, the fee set in the retainer agreement signed by Lead Counsel is lower than the fee set by auction. *See* Pugh Decl at ¶ 17. The *retainer fee set a decreasing percentage-of-recovery fee as recovery increased;* the fee set by the Court escalates. The "crossover point"—the amount of recovery where the fee set by auction exceeds than that set by retainer agreement—is $1.263 billion. Weiss Aff. at ¶ 27(e)(v); Pugh Aff. Ex. D (grid comparing auction and retainer agreement fees). It is only now that the actual recovery is known that the two fee schedules can be evaluated to see which one results in the lowest fee. At a $3.1 billion settlement, the fee set by auction is $262 million; by retainer $186 million.

The city states: "Only in hindsight do we know that the Court's grid did not produce the lowest fee structure." Pugh Decl ¶ 19. This argument is off-target. The *purpose of the auction was to obtain* the legal market's lowest qualified bid through adversarial competition at the onset of litigation. And it did. The city's fee analysis is precisely the after-the-fact reevaluation of the fee that the Court sought to prevent by setting the fee scale while the size of recovery was unknown. *See, e.g., In re First Fidelity Bancorp. Securities Litig.,* 750 F.Supp. 160 (D.N.J.1990) ("The percentage of recovery should be negotiated and fixed while the risks and amount of recovery are still unknown"); Task Force Rep. at 255–56 ("the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement"). The post hoc comparison advanced by the city, in the words of Judge Sarokin, is "akin to placing a wager after the outcome of the event is known or playing poker with everyone's cards face up." *First Fidelity,* 750 F.Supp. at 163.

Here the city did not attempt to enforce the grid set out in the retainer agreement anytime before "the outcome of the event [was] known." This objection based entirely on the benefit of 20–20 hindsight will not be accepted. The Court again notes that neither of the other two co-Lead Plaintiffs seeks to enforce the retainer agreement. This lends credence to Lead Counsel's argument that co-Lead Plaintiffs understood that the fee set by auction superseded any earlier fee arrangement.

The city's remaining arguments—use of lodestar to cross-check the fee; its reliance on *In re Prudential;* and the role of Lead Plaintiff—have been addressed. This Court affirms its use of an auction process to set attorneys' fees under the PSLRA:

As mentioned, the Court acknowledges lead plaintiffs' statutory opportunity [to choose counsel]. However, whether under the present statute or earlier discipline, the Court is the final arbiter of fees sought by successful plaintiffs' lawyers in this action. *See* Fed.R.Civ.P. 23(e); 15 U.S.C. § 77z–1(a)(6). The mechanism of an auction gives to the Court a measure of needed foresight to meet its obligations to members of the group. The Court need not be compelled to learn by hindsight—to be told at the end of months or years of litigation, "this is what we seek for services rendered."

The Court is required to protect the interests of all members of the class. If Congress had intended otherwise with its PSLRA, it could have easily permitted lead plaintiff to designate and retain counsel without judicial approval. It did not.

*In re Cendant,* 182 F.R.D. at 151.

### Throenle and Schonbrun

Throenle's objection that the fee request is premature ignores the clear statement in the settlement notice that "[a]t the conclusion of the Settlement Hearing ... Lead Counsel will apply" for fees. Notice ¶ 38.

Her objection that Cendant and E & Y should pay the fees ignores the provision in the settlement agreement that all sides are to bear their own legal costs. Notice ¶¶ 23–25.

Schonbrun's assertion that detailed time records should be filed has been addressed in the Court's discussion of lodestar. *In re Prudential* held that a district court does not abuse its discretion to not require the submission of detailed time records. 148 F.3d at 342. Finally, his objection to the Lazard Frères fee is rejected because the investment bank provided needed services to the class. *See* Garner Decl; Section G, below.

### G. Expenses

Lead Counsel have submitted affidavits which set out their own expenses and those incurred by experts they hired to facilitate litigation and settlement negotiation. The experts have also supplied the Court with declarations which detail their efforts on behalf of the class. Counsel's use of the experts, particularly Lazard Frères, is also set out in the companion opinion assessing settlement. "There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund." *Lachance v. Harrington,* 965 F.Supp. 630, 651 (E.D.Pa.1997).

The bulk of counsel's expenses relate to the use of Lazard Frères, whose fee correlates to the amount of recovery in the Cendant settlement. This investment bank was selected by Lead Counsel using an auction process to find the best expert at the lowest cost to the class. Joint Decl. at ¶ 152. Lead Counsel discussed the necessity for and retention of such experts informally with the Court early on. The Court had no objection then and none now. It expected competent counsel to seek competent assistance, if required, in a case of this magnitude. According to Lead Counsel, the analysis prepared by Lazard Frères "assisted significantly in settlement negotiations ... and were significant in Lead Plaintiffs' decision to agree to the Cendant settlement." Joint Decl. ¶ 120, ¶¶ 112–19, 151–54 (detailing efforts of experts); *see also* Garner Aff. The expertise of Forensic Economics, Marks Paneth, and Arthur S. Ainsberg also were necessary to the successful negotiation.

The Court concludes that the expenses are reasonable and were necessary to the class. This case, this class, required and demanded quality evaluation and prosecution of the claims against the defendants. The outstanding result justifies the expenditures for expert advice. Usually one gets what one pays for; here significant help in negotiating this colossal settlement from qualified experts. This Court does not recognize "reasonable" as a synonym for "cheap." Reasonableness of price reflects the force of market competition by qualified providers of requested services. Lead Counsel are also entitled to be reimbursed $528,812 in law firm costs which include such expenses as photocopying and electronic research.

"Class Counsel has provided adequate accountings of litigation expenses which tie the purported expenses to a specified legal product." *NASDAQ,* 187 F.R.D. at 489–90; Joint Decl. ¶ 151. The requested allowance of expenses is approved.

However, the circumstances and timing of the settlement do not warrant the grant of interest on fees and costs sought by Lead Counsel.

### H. PRIDES Counsel's Fee Request

PRIDES Lead Counsel has petitioned for counsel fees because of an issue discussed by him regarding post-April 15, 1998 claims. However, Lead Counsel also raised and discussed that issue. The Court is constrained to find such duplication coincidental; an award of fees in this action would not be warranted.

### I. Conclusion

In calling for a fee auction in September 1998, the Court said that "this is not an invitation for cheapness of costs resulting from cheapness of quality" and anticipated "that professional skills of high order will be forthcoming by this procedure." *In re Cendant*, 182 F.R.D. at 152. That confidence has been realized by excellent settlements of uncommon amount engineered by highly skilled counsel with reasonable cost to the class. And effected within a pragmatic timetable. Attorneys' fees in the amount of $262,468,857 and expenses of $14,623,806 are awarded.